# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| JEFFREY STEIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 13-cv-00571 (TSC) |
| | ) | |
| U.S. DEPARTMENT OF JUSTICE, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION

Plaintiff Jeffrey Stein brings six claims under the Freedom of Information Act, 5 U.S.C. § 552, *et seq.*, as amended ("FOIA"), concerning six unrelated FOIA requests he made to the Federal Bureau of Investigation (the "FBI"), the Civil Division of the United States Department of Justice (the "Civil Division") and the Executive Office for United States Attorneys (the "Executive Office"), all of which are components of Defendant the United States Department of Justice ("DOJ").

Defendant moved for summary judgment as to all six claims, with the parties briefing Counts I, II and III (which pertain to records sought from the FBI and the Civil Division) separately from Counts IV, V and VI (which pertain to records sought from the FBI and the Executive Office), per the court's order.

Upon consideration of Defendant's motions for summary judgment, the responses thereto and the replies in support thereof, and for the reasons set forth below, summary judgment is GRANTED on Counts I, II, III and VI; DENIED on Count IV; and GRANTED IN PART and DENIED IN PART on Count V.

## I.      BACKGROUND AND PROCEDURAL HISTORY

For the sake of clarity, and because each count of the Complaint relates to a different FOIA request, each count will be discussed separately. Counts I and II were previously part of the case *Ryan Shapiro, et al. v. Dep't of Justice*, Civ. A. No. 1:12-cv-01883 (BAH) (D.D.C.), but were severed from that case and refiled in this action.

### a.  Count I (FBI Work Processing Unit Case Evaluation Forms)

On September 13, 2011, Plaintiff submitted a FOIA request to the FBI for all Work Processing Unit ("WPU") Case Evaluation Forms that it had completed since October 2008. According to Plaintiff, these forms are completed during random quality control audits of FOIA requests. (Compl. ¶ 8).

In December 2011, the FBI informed Plaintiff that it had failed to find any responsive records during a two-hour search of approximately 345 records, and estimated that searching approximately 18,322 additional potentially responsive records would consume over 106 hours of search time. (First Hardy Decl. ¶ 9). The FBI further stated that it would be unreasonably burdensome to search every FOIA request file to locate the requested Case Evaluation Forms, and that it would close Plaintiff's request unless he agreed to limit its scope. (First Hardy Decl. Ex. E; Compl. ¶ 11).

The FBI eventually advised Plaintiff that it had learned that WPU Case Evaluation Forms are normally maintained in employees' personnel folders for a period of one year before they are destroyed. (First Hardy Decl. Ex. G). Based on this fact, the FBI took the position that retrieval and reproduction of the forms would be a "clearly unwarranted" invasion of personal privacy, and that the forms were therefore exempt entirely from FOIA pursuant to exemptions (b)(2) and (b)(6). (First Hardy Decl. Ex. G).

In response, Plaintiff limited the scope of his request to all Case Evaluation Forms located in WPU employees' personnel folders, regardless of their creation date, and stated that the FBI could redact its employees' personally identifiable information from the forms. (First Hardly Decl. Ex. H; Compl. ¶ 13). The FBI responded by again asserting exemptions (b)(2) and (b)(6) as to all the forms. (First Hardly Decl. Ex. I; Compl. ¶ 14).

Plaintiff appealed the FBI's assertion of exemptions (b)(2) and (b)(6) to DOJ's Office of Information Policy ("OIP"), and OIP eventually closed the appeal after Plaintiff challenged the FBI's assertion of these exemptions in the *Shapiro* case, which Plaintiff filed in November 2012. (First Hardy Decl. Exs. J-L; Compl. ¶¶ 15-16).

Here, Plaintiff does not challenge the adequacy of the FBI's search, but challenges both claimed exemptions.

   b.   Count II (FBI Reference Materials for ACS and FDPS Programs)

On September 13, 2011, Plaintiff submitted a FOIA request to the FBI for all manuals, training materials and similar reference materials regarding the Automated Case Support ("ACS") and FOIA Document Processing System ("FDPS") programs utilized by the FBI's Record/Information Dissemination Section. (First Hardy Decl. Ex. M; Compl. ¶ 20).

The FBI released a number of records to Plaintiff in March 2012. (First Hardy Decl. ¶ 23; Compl. ¶ 22). It stated that it had reviewed 643 pages of records, 376 pages of which it released to Plaintiff in full or in part, with the balance withheld pursuant to FOIA exemptions (b)(6), (b)(7)(C), (b)(7)(D) and (b)(7)(E). (First Hardy Decl. Ex. R). These 643 pages comprised two documents: The 274-page ACS Basic Reference Guide and the 369-page FDPS Manual.

Plaintiff appealed the FBI's assertion of FOIA exemption (b)(7)(E) to OIP, specifically noting that he did not appeal the FBI's assertion of the other three FOIA exemptions. (First

Hardy Decl. Ex. S; Compl. ¶ 23).  Subsequently, OIP remanded the FOIA request to the FBI for reprocessing to determine whether any additional material could be released to Plaintiff.  (First Hardy Decl. Ex. U; Compl. ¶ 24).

In October 2012, after re-reviewing the same 643 pages of records, the FBI released to Plaintiff 396 pages in full or part – 20 more pages than it had released in March 2012 – with certain information again withheld pursuant to the same four FOIA exemptions.  (First Hardy Decl. Ex. V; Compl. ¶ 26).

Plaintiff again appealed the FBI's assertion of FOIA exemption (b)(7)(E) to OIP.  (First Hardy Decl. Ex. W; Compl. ¶ 27).  OIP eventually closed the appeal after Plaintiff challenged the FBI's assertion of exemption (b)(7)(E) in the *Shapiro* case.  (First Hardy Decl. Ex. Y; Compl. ¶ 27).

Plaintiff does not challenge the adequacy of the FBI's search, and does not challenge any of the withholdings from the 369-page FDPS Manual.  Instead, Plaintiff challenges only the FBI's assertion of exemption (b)(7)(E) with regard to the 274-page ACS Basic Reference Guide, only 27 pages of which were released to him.

    c.  Count III (Civil Division Monographs)

On September 13, 2011, Plaintiff submitted a FOIA request to the Civil Division for copies of three monographs: *Chevron Notes* (2009), *The Governmental Privileges* (September 2006) and *Defending Actions Brought Pursuant to the Privacy Act of 1974* (1982).  (Kovakas Decl. Ex. A; Compl. ¶ 31).

In January 2011, the Civil Division advised Plaintiff that it was withholding in full all records responsive to the request – three monographs totaling 166 pages – as "intra-agency

monographs consisting of agency attorney opinions" under exemption (b)(5). (Kovakas Decl. Ex. B; *id.* ¶ 5; *see also* Compl. ¶ 33).

Plaintiff appealed the withholdings to OIP, which affirmed, advising Plaintiff that it had reviewed his appeal and determined that the records were properly withheld under the exemption. (Kovakas Decl. ¶ 4 (citing Ex. C thereto); Compl. ¶ 34).

Plaintiff does not challenge the adequacy of the Civil Division's search, but challenges its assertion of exemption (b)(5).

### d. Count IV (Executive Office Records from USABook Desktop Library)

On September 13, 2011, Plaintiff submitted a FOIA request to the Executive Office for all records in the USABook Desktop Library maintained by the DOJ Office of Legal Education indexed under the topic "Freedom of Information." (Luczynski Decl. Ex. A; Compl. ¶ 37).

In November 2011, the Executive Office notified Plaintiff that it was withholding in full 38 print-out pages that captured what it described as "the Chapters relevant to the request in the FOIA portion of the USABook" pursuant to exemptions (b)(5) and (b)(7)(E). (Luczynski Decl. ¶ 8 (citing Ex. C thereto); Compl. ¶ 39).

Plaintiff appealed the Executive Office's assertion of these exemptions and the adequacy of the Executive Office's search to OIP, which subsequently remanded the request to the Executive Office for further processing. (Compl. ¶¶ 40, 41).

In September 2013, counsel for Defendant e-mailed Plaintiff a redacted copy of the list of links on what she referred to as the USABook FOIA Topic Page. (Luczynski Decl. Ex. D; Pl. Second Opp. Ex. C). Defendant states that this list was sent for the sole purpose "of reaching a settlement and without any intentional or inadvertent waiver of the non-responsive determination [the Executive Office] originally made." (Luczynski Decl. ¶ 11 (citing Ex. D thereto)).

In May 2014, counsel for Defendant e-mailed Plaintiff three of the 38 pages being withheld – two pages titled "Freedom of Information" discussing wiretap recordings and a one-page memo titled "FOIA and District Discover[y] Policies" – after confirming that these pages had previously been publicly released. (Luczynski Decl. ¶¶ 12-13 (citing Ex. E thereto)).

Plaintiff argues that the Executive Office construed his FOIA request too narrowly and challenges its assertion of exemptions (b)(5) and (b)(7)(E) over the material withheld.

e.   Count V (FBI Records regarding Christopher Hitchens)

On January 9, 2012, Plaintiff submitted a FOIA request to the FBI for all records, including cross-references, regarding the late Christopher Hitchens, the noted British author and journalist. (Fourth Hardy Decl. Ex. A; Compl. ¶ 45).

In March 2012, the FBI released to Plaintiff 19 pages of material previously processed for another requester, with certain information exempted pursuant to FOIA exemptions (b)(1), (b)(6), (b)(7)(C), (b)(7)(D) and (b)(7)(E). (Fourth Hardy Decl. ¶ 8 (citing Ex. C thereto); Compl. ¶ 47).

Plaintiff appealed the adequacy of the search and the FBI's assertion of exemptions to OIP. (Fourth Hardy Decl. Ex. D; Compl. ¶ 48). OIP remanded Plaintiff's request for additional searches, and otherwise affirmed the FBI's determination, including the assertion of all exemptions. (Fourth Hardy Decl. Ex. F; Compl. ¶ 50).

After conducting additional searches, the FBI reviewed 65 pages of records and released 42 of those pages to Plaintiff in full or in part, with certain information exempted pursuant to the same five FOIA exemptions, as well as exemption (b)(3). (Fourth Hardy Decl. ¶ 13).

Plaintiff does not challenge the adequacy of the FBI's search for the Hitchens records, and challenges only its assertion of exemption (b)(7)(D).

### f.   Count VI (FBI Records regarding Gwyneth Todd)

In May 2012, Plaintiff and Gwyneth Todd jointly submitted a FOIA request to the FBI for all FBI records regarding Todd. (Fourth Hardy Decl. Ex. G). The request specified that Plaintiff sought "all records about the events last year" involving an FBI agent that Todd claimed had visited her Canberra, Australia home under false pretenses. (*Id.*). Plaintiff and Todd requested a fee waiver and provided a privacy waiver form signed by Todd, which authorized the FBI to release the requested information to both Plaintiff and his counsel. (*Id.*; Compl. ¶ 54).

On April 26, 2013, Plaintiff commenced this action, citing constructive exhaustion based on the fact that twenty working days had elapsed from the time of his request without a substantive determination by the FBI. (Compl. ¶ 57).

In November 2013, the FBI denied Plaintiff's fee waiver request and informed him that it had located approximately 10,000 pages of potentially responsive material. (Fourth Hardy Decl. Ex. I). Pursuant to 28 C.F.R. § 16.11, Plaintiff was advised that the estimated fee associated with his FOIA request was $290.00, which exceeded $250.00; therefore, the FBI requested partial advance payment of $72.50 within thirty days. (Fourth Hardy Decl. ¶ 17 (citing Ex. I thereto)). Plaintiff was also advised that he could consider reducing the scope of his request to accelerate the processing and potentially reduce the fees associated with his request. (*Id.*).

In the meantime, consistent with 28 C.F.R. § 16.1 l(d)(3)(i), the FBI reviewed one file consisting of 174 pages and released 147 pages to Plaintiff in full or in part, with certain information exempted pursuant to FOIA exemptions (b)(6), (b)(7)(C) and (b)(7)(E). (*Id.* ¶ 18 & n.2). In February 2014, the FBI advised Plaintiff that it had administratively closed his FOIA request without processing any records beyond the 174 pages that it had processed pursuant to 28 C.F.R. § 16.1 l (d)(3)(i), due to his unwillingness to pay the fees associated with processing his request. (*Id.* ¶ 18).

Plaintiff challenges the denial of his fee waiver request.[1]

## II.   LEGAL STANDARD

### a.   Motion for Summary Judgment

Summary judgment may be granted if a movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) ("the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."); *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006). Summary judgment may be rendered on a "claim or defense . . . or [a] part of each claim or defense." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A). "A fact is 'material' if a dispute over it might affect the outcome of a suit under the governing law; factual disputes that are 'irrelevant or unnecessary' do not affect the summary judgment determination. An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Holcomb*, 433 F.3d at 895 (quoting *Liberty Lobby*, 477 U.S. at 248) (citation omitted). The party seeking summary judgment "bears the heavy burden of establishing that the merits of his case are so clear that expedited action is justified." *Taxpayers Watchdog, Inc., v. Stanley*, 819 F.2d 294, 297 (D.C. Cir. 1987).

---

[1] In his opposition to Defendant's second motion for summary judgment, Plaintiff reserves the right to challenge the adequacy of the FBI's search and any future withholdings related to the FOIA request at issue in Count VI if the court determines that he is entitled to a fee waiver. (Pl. Second Opp. at 2).

In considering a motion for summary judgment, "the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in [their] favor." *Liberty Lobby*, 477 U.S. at 255; *see also Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 850 (D.C. Cir. 2006) ("We view the evidence in the light most favorable to the nonmoving party and draw all inferences in its favor."). The nonmoving party's opposition, however, must consist of more than mere unsupported allegations or denials, and must be supported by affidavits, declarations or other competent evidence setting forth specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The nonmovant is required to provide evidence that would permit a reasonable jury to find in his favor. *See Laningham v. U.S. Navy*, 813 F.2d 1236, 1242 (D.C. Cir. 1987).

### b. FOIA

"FOIA provides a 'statutory right of public access to documents and records' held by federal government agencies." *Citizens for Responsibility & Ethics in Washington v. DOJ*, 602 F. Supp. 2d 121, 123 (D.D.C. 2009) (quoting *Pratt v. Webster*, 673 F.2d 408, 413 (D.C. Cir. 1982)). FOIA requires that federal agencies comply with requests to make their records available to the public, unless such "information is exempted under [one of nine] clearly delineated statutory [exemptions]." *Id.* (internal quotation marks omitted); *see also* 5 U.S.C. §§ 552(a)-(b).

"'FOIA cases typically and appropriately are decided on motions for summary judgment.'" *Georgacarakos v. FBI*, 908 F. Supp. 2d 176, 180 (D.D.C. 2012) (quoting *Defenders of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 87 (D.D.C. 2009)). The district court conducts a *de novo* review of the government's decision to withhold requested documents under any of FOIA's specific statutory exemptions. *See* 5 U.S.C. § 552(a)(4)(B). Thus, the burden is on the agency to show that nondisclosed, requested material falls within a stated exemption. *See*

*Petroleum Info. Corp. v. U.S. Dep't of the Interior*, 976 F.2d 1429, 1433 (D.C. Cir. 1992) (citing 5 U.S.C. § 552(a)(4)(B)); *Liberty Lobby*, 477 U.S. at 254.

In cases concerning the applicability of exemptions and the adequacy of an agency's search efforts, summary judgment may be based solely on information provided in the agency's supporting declarations. *See, e.g., ACLU v. U.S. Dept. of Def.*, 628 F.3d 612, 619 (D.C. Cir. 2011); *Students Against Genocide v. Dept. of State*, 257 F.3d 828, 838 (D.C. Cir. 2001). "If an agency's affidavit describes the justifications for withholding the information with specific detail, demonstrates that the information withheld logically falls within the claimed exemption," and "is not contradicted by contrary evidence in the record or by evidence of the agency's bad faith, then summary judgment is warranted on the basis of the affidavit alone." *ACLU*, 628 F.3d at 619. "Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'" *Id.* (quoting *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009)). However, an agency's "affidavits must show, with reasonable specificity, why the documents fall within [a given] exemption. The affidavits will not suffice if the agency's claims are conclusory, merely reciting statutory standards, or if they are too vague or sweeping." *Hayden v. Nat'l Sec. Agency*, 608 F.2d 1381, 1387 (D.C. Cir. 1979). This requirement is consistent with an agency's general obligation to create "as full a public record as possible, concerning the nature of the documents and the justification for nondisclosure." *Id.* at 1384. Additionally, a motion for summary judgment should be granted in favor of a FOIA requester "[w]hen an agency seeks to protect material which, even on the agency's version of the facts, falls outside the proffered exemption." *Coldiron v. DOJ*, 310 F. Supp. 2d 44, 48 (D.D.C. 2004) (quoting *Petroleum Info. Corp.*, 976 F.2d at 1433).

FOIA also requires that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt." 5 U.S.C. § 552(b). More specifically, "[i]t has long been a rule in this Circuit that non-exempt portions of a document must be disclosed unless they are inextricably intertwined with exempt portions." *Mead Data Cent., Inc. v. U.S. Dep't of the Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977). In order to withhold a record or portion thereof under a FOIA exemption, "the Government must make that showing in its *Vaughn* index and in such affidavits as it may submit therewith." *Kimberlin v. DOJ*, 139 F.3d 944, 950 (D.C. Cir. 1998). "The purpose of a *Vaughn* index is to permit adequate adversary testing of the agency's claimed right to an exemption, and those who contest denials of FOIA requests – who are, necessarily, at a disadvantage because they have not seen the withheld documents – can generally prevail only by showing that the agency's *Vaughn* index does not justify withholding information under the exemptions invoked." *Schiller v. NLRB*, 964 F.2d 1205, 1209 (D.C. Cir. 1992) (internal quotation marks and citations omitted).

## III.   ANALYSIS

### a.   Count I (FBI Work Processing Unit Case Evaluation Forms)

The FOIA request at issue in Count I seeks all FBI WPU Case Evaluation Forms located in WPU employees' personnel folders, regardless of their creation date. The FBI asserted FOIA exemptions (b)(2) (covering agency personnel rules and practices) and (b)(6) (covering personnel and other private files) in withholding all documents responsive to Plaintiff's request. Initially, the agency appeared to rely on each exemption to categorically withhold all forms. (*See* First Hardy Decl. ¶¶ 44-45). Plaintiff objected to the withholding of all forms under exemption (b)(6), correctly noting that the exemption has generally been held to categorically protect only names and identifying information. The FBI then clarified in its reply brief that it

"categorically denied the request under [e]xemptions (b)(2) and (b)(6) together," as exemption (b)(6) "protects employee names but not the other information on them" while exemption (b)(2) "protects the other information on the forms but not employee names." (Def. First Reply at 5). The FBI therefore concluded that, together, the two exemptions supported its "categorical denial of the forms." (*Id.*). Since the parties agree that employee names and other identifying information are properly withheld pursuant to exemption (b)(6), the only issue for the court to decide is whether the balance of the information on the forms may be withheld under exemption (b)(2).

According to the FBI, WPU Case Evaluation Forms are maintained in administrative personnel files "for purposes of tracking and evaluating the performance of employees who process FOIA and Privacy Act requests" and are "solely internal" and "kept by the agency for its own use," reflecting the FBI's "internal administrative practices with respect to the management and evaluation of FBI personnel." (First Hardy Decl. ¶ 44). Each form "applies to a particular person" (*id.* ¶ 45), and the forms "are used solely as a tool for evaluating employee performance and as a learning tool for employees who may need to focus on improving skills in particular areas. They exist only for this purpose." (Third Hardy Decl. ¶ 5). The FBI also states these forms are "related to hiring, firing, discipline, compensation, benefits, and the like" because "[t]hey can reflect poor performance, which can be a basis for removal from Federal service, demotion, or reassignment," and can also "reflect good performance, which can be the basis for promotion or performance awards." (*Id.* ¶ 9). The FBI argues that "[e]mployees maintain a substantial privacy interest in information about them and their performance that is maintained in their administrative personnel files," and that "disclosure of this information would constitute a clearly unwarranted invasion of personal privacy" (First Hardy Decl. ¶ 45), as it could cause

employees "embarrassment or humiliation if forms reflecting deficiencies in their performance were publicly released." (Third Hardy Decl. ¶ 10).

The blank two-page WPU Case Evaluation Form that Plaintiff attached to his brief supports the FBI's position that the forms are used by supervisors to evaluate the performance of FBI personnel tasked with processing FOIA requests. For example, the form contains a "Correction List" with 36 checkboxes denoting different errors that a FOIA request processor may make, as well as three checkboxes for a supervisor's overall assessment of a processor's job performance: "Unacceptable," "Satisfactory" and "Error Free."

### i. Exemption (b)(2)

Exemption (b)(2) provides that FOIA "does not apply to matters that are . . . related solely to the internal personnel rules and practices of an agency." 5 U.S.C. § 552(b)(2). Until 2011, following the D.C. Circuit's opinion in *Crooker v. Bureau of Alcohol, Tobacco & Firearms,* 670 F.2d 1051 (1981), courts in this Circuit applied exemption (b)(2) to two categories of documents: Materials concerning human resources and employee relations (referred to as "Low 2"), and predominantly internal materials whose disclosure would significantly risk circumvention of agency regulations or statutes (referred to as "High 2").

The Supreme Court overturned *Crooker* in *Milner v. Dep't of Navy*, 562 U.S. 562, 571 (2011), analyzing the exemption's statutory language to conclude "that Low 2 is all of 2 (and that High 2 is not 2 at all)." The Court explained that while "[j]udicial decisions since FOIA's enactment have analyzed and reanalyzed the meaning" of exemption (b)(2), "comparatively little attention has focused on the provision's 12 simple words: 'related solely to the internal personnel rules and practices of an agency.'" 562 U.S. at 569. "The key word in that dozen – the one that most clearly marks the provision's boundaries – is 'personnel.'" *Id.*

13

The Court found that the word "personnel" was used in the exemption to "refer[] to human resources matters," and in common parlance to refer to "'the selection, placement, and training of employees and . . . the formulation of policies, procedures, and relations with [or involving] employees or their representatives.'" *Id.* (quoting Webster's Third New International Dictionary 1687 (1966)). The Court also found that "'the common and congressional meaning'" of the phrase "personnel file" is "the file 'showing, for example, where [an employee] was born, the names of his parents, where he has lived from time to time, his . . . school records, results of examinations, [and] evaluations of his work performance'" – in short, the type of file "typically maintained in the human resources office." *Id.* at 570 (quoting *Department of Air Force v. Rose*, 425 U.S. 352, 377 (1976)). The Court thus concluded that "[a]n agency's 'personnel rules and practices' are its rules and practices dealing with employee relations or human resources," noting that "all the rules and practices referenced in [exemption (b)(2)] share a critical feature: They concern the conditions of employment in federal agencies – such matters as hiring and firing, work rules and discipline, compensation and benefits." *Id.* at 571.

In addition to being "personnel records," government records also must satisfy the other requirements of exemption (b)(2) in order to be exempt from disclosure under FOIA. To wit, the "[i]nformation must 'relat[e] solely' – meaning, as usual, 'exclusively or only' – to the agency's 'personnel rules and practices'" and "the information must be 'internal'; that is, the agency must typically keep the records to itself for its own use." *Id.* at 570 n.4 (citations omitted). Plaintiff does not dispute that the WPU Case Evaluation Forms are internal agency records. Instead, he disputes whether the forms relate *solely* to personnel rules and practices, or whether they are also related to other agency purposes, such as "the non-personnel function of evaluating FOIA systems and processes." (Pl. First Opp. at 7).

The Supreme Court's opinion in *Milner* makes clear that the WPU Case Evaluation Forms are personnel records, given that the forms contain "evaluations of [employees'] work performance" and concern "the selection, placement, and training of employees" and "employee relations or human resources," including "such matters as hiring and firing, work rules and discipline, compensation and benefits." *Milner*, 562 U.S. at 569-70 (citations omitted). The information on each form "applies to a particular person" (First Hardy Decl. ¶ 45), and the forms "exist only for th[e] purpose" of "evaluating employee performance" and helping "employees who may need to focus on improving skills in particular areas." (Third Hardy Decl. ¶ 5). The court also credits the FBI's representations that the forms relate to hiring, firing, discipline, compensation, benefits, and the like, given their obvious use as a tool to evaluate the job performance of individual employees. Clearly, then, the forms relate to "'[p]ersonnel management,'" which the Supreme Court defined as "'the phase of management concerned with the engagement and effective utilization of manpower to obtain optimum efficiency of human resources.'" *Milner*, 562 U.S. at 569 (quoting Webster's 1687).

While Plaintiff acknowledges that the forms "can relate to evaluation of an employee's performance," he argues that because the forms "can also relate to measuring and improving the overall quality of the FOIA service provided by the agency," they do not relate *solely* to personnel practices. (Pl. First Opp. at 7). This argument is unpersuasive, as taking it to its logical conclusion would mean that personnel evaluations could *never* relate solely to personnel practices, because an employee evaluative process always has the simultaneous goal of improving not only the performance of individual employees, but also agency-wide performance. This surely cannot be true, particularly in light of *Milner's* finding that personnel management is essentially "quality assurance" of human resources. (*Id.*).

Plaintiff's assertion that the WPU Case Evaluation Forms "*can* also relate" to the FBI's FOIA process more generally is also both conclusory and speculative. (*Id.*) (emphasis added). Plaintiff offers no evidence to rebut the FBI's representation that the forms "were created and are used solely as a tool for evaluating employee performance and as a learning tool for employees who may need to focus on improving skills in particular areas" and "exist only for this purpose." (Third Hardy Decl. ¶ 5). While Plaintiff may be able to imagine some conceivable use for the forms aside from the purposes for which the FBI has declared that it actually uses them, such speculation does not change the fact that they are used only as part of "the internal personnel rules and practices of an agency." 5 U.S.C. § 552. If an agency declares that an internal agency document is used solely for personnel purposes and that declaration "is not contradicted by contrary evidence in the record or by evidence of the agency's bad faith, then summary judgment is warranted." *ACLU*, 628 F.3d at 619.

Here, there is no evidence in the record indicating that the WPU Case Evaluation Forms are used as some kind of broad "quality assurance measure" for "improving the overall quality of the FOIA service provided by the agency" as opposed to or in addition to simply being used for evaluating the performance of individual employees. (Pl. First Opp. at 7). Indeed, the forms themselves suggest that they are not used to improve the FBI's FOIA process, generally, but are instead employee-specific. For example, the "Correction List" includes checkboxes like "Grammatically incorrect/misspelling(s) of outgoing communications" and "Failed to prioritize work and multi-task." These are not indicia of the FOIA *process*, but of the FOIA *processor*, as there is no non-personnel use for this type of information. Additionally, because "[m]istakes or deficiencies identified by supervisors that are reflected on the forms are corrected prior to FOIA releases" (Third Hardy Decl. ¶ 7), these forms do not reveal "the type of information that the

public needs to monitor official actions." (Pl. First Opp. at 9). Rather, they show only the "type of normal review and correction of work [that] goes on every day in likely every workplace." (Def. First Reply at 4).

For these reasons, the court finds that the WPU Case Evaluation Forms sought by Plaintiff relate solely to the FBI's internal personnel rules and practices, and as such are exempt from disclosure under FOIA. The court therefore grants Defendant's motion for summary judgment on Count I.

b. Count II (FBI Reference Materials for ACS and FDPS Programs)

The FOIA request at issue in Count II seeks from the FBI all manuals and other reference materials concerning its FDPS and ACS programs. According to the FBI's declaration, FDPS is a request management system used by government agencies to process FOIA and Privacy Act requests (First Hardy Decl. Ex. M ¶¶ 32-34), and ACS is "the search engine by which the FBI searches" its Central Records System ("CRS"), which is "the record system in which the FBI maintains information it has acquired and compiled in the course of fulfilling its mandated law enforcement responsibilities." (*Id.* ¶ 53).

Two documents were responsive to this request: The 369-page FDPS Manual, the withholdings from which Plaintiff does not challenge, and the 274-page ACS Basic Reference Guide, the withholdings from which Plaintiff does challenge.

The FBI asserts that it withheld information in the ACS Basic Reference Guide that concerned "techniques and procedures" that it uses "in conducting investigations, the release of which would reveal what types of techniques and procedures are routinely used in such investigations, and non-public details about when, how, and under what circumstances they are used." (First Hardy Decl. ¶ 55). The FBI also represents that

> [t]o describe this information in further detail on the public record would identify the very information that [it sought] to protect pursuant to th[e] exemption. Specifically, revealing what techniques and procedures are commonly used in law enforcement investigations (*e.g.*, criminal or national security), and the details and circumstances under which they are used, would enable the targets of these techniques to avoid detection or develop countermeasures to circumvent the ability of the FBI and/or law enforcement authorities to effectively use these important law enforcement techniques in future investigations, therefore allowing for circumvention of the law.

(First Hardy Decl. ¶ 55). The FBI further declares that releasing the withheld portions of the ACS Basic Reference Guide "would identify where and how particular sorts of data are recorded within [its] proprietary computer system[s]," as ACS "is the primary tool used by FBI special agents and support personnel to . . . conduct federal criminal, national security, and intelligence investigations." (*Id.* ¶ 55(a)). As such, "revelation of particular contents of the ACS would increase the risk that targets of investigations might . . . gain unauthorized access to, view and manipulate data on, or otherwise interfere with the FBI's system." (*Id.*).[2]

Plaintiff argues that the FBI has not given the court any way of determining what portion of the ACS Basic Reference Guide's 274 pages is legitimately withheld and has not sufficiently explained how disclosing more of its contents could reasonably be expected to risk circumvention of the law. (Pl. First Opp. at 17).

### i. Exemption (b)(7)(E)

FOIA exemption (b)(7)(E) shields law enforcement records that, if produced, "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would

---

[2] The FBI also withheld the street address of an FBI off-site records storage facility pursuant to exemption (b)(7)(E). (*See* First Hardy Decl. ¶¶ 49, 56). Plaintiff does not appear to challenge this particular withholding, and the court will treat Defendant's arguments relating to that withholding as conceded. *See Baptist Mem'l Hosp.-Golden Triangle v. Leavitt*, 536 F. Supp. 2d 25, 40 (D.D.C. 2008), *aff'd sub nom. Baptist Mem'l Hosp.-Golden Triangle v. Sebelius*, 566 F.3d 226 (D.C. Cir. 2009) ("A Party that fails to refute an opposing party's argument on Summary Judgment may be found to have conceded the point."); *see also* LCvR 7(b).

disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E). Some courts in this Circuit have held that the "risk of circumvention of the law" provision applies only to guidelines, while others have held that this requirement applies to techniques and procedures as well. *See generally* DOJ, *Guide to the Freedom of Information Act: Exemption 7(E)* at 1-5 (Apr. 23, 2013), *available at* http://www.justice.gov/oip/foia-guide13/exemption7e.pdf (last accessed Apr. 2, 2014) (surveying cases). This court need not wade into this debate however, since it finds, for the reasons set forth below, that Defendant has satisfied the stricter reading of the exemption by establishing that disclosure of the techniques and procedures described in the withheld portions of the ACS Basic Reference Guide could reasonably be expected to risk circumvention of the law.

D.C. Circuit precedent "sets a relatively low bar for [an] agency to justify withholding" information under this reading of exemption (b)(7)(E). *Blackwell v. F.B.I.*, 646 F.3d 37, 42 (D.C. Cir. 2011). The exemption allows for withholding records or information

> not just for circumvention of the law, but for a risk of circumvention; not just for an actual or certain risk of circumvention, but for an expected risk; not just for an undeniably or universally expected risk, but for a reasonably expected risk; and not just for certitude of a reasonably expected risk, but for the chance of a reasonably expected risk.

*Mayer Brown LLP v. IRS*, 562 F.3d 1190, 1193 (D.C. Cir. 2009). Thus, an agency must only "demonstrate logically how the release of the requested information *might* create a risk of circumvention of the law." *Id.* at 1194 (emphasis added).

The D.C. Circuit's opinion in *Blackwell* is instructive here. That case concerned the invocation of exemption (b)(7)(E) with regard to two kinds of information: (i) details about procedures used during the FBI's forensic examination of a computer, and (ii) methods of data collection, organization and presentation contained in a certain kind of report. *See* 646 F.3d

at 42.  As to the details regarding forensic examinations of computers, the Court held that the FBI's explanation that "[t]he release of specifics of these investigative techniques would risk circumvention of the law by individuals who seek to utilize computers in violation of laws" because it would "expos[e] computer forensic vulnerabilities to potential criminals" satisfied the (b)(7)(E) standard.  *Id.* (citation omitted).  As to the methods of data collection, organization and presentation, the Court held that the invocation of exemption (b)(7)(e) was justified by the FBI's representations that these methods constituted "internal technique[s], not known to the public," which had been developed "to meet the specific investigative needs of the FBI," and that disclosure of the requested reports "could enable criminals to employ countermeasures to avoid detection, thus jeopardizing the FBI's investigatory missions."  *Id.* (citation omitted).

Here, the FBI has represented that ACS "is the primary tool used by FBI special agents and support personnel to . . . conduct federal criminal, national security, and intelligence investigations" by searching CRS, "the record system in which the FBI maintains information it has acquired and compiled in the course of fulfilling its mandated law enforcement responsibilities."  (First Hardy Decl. ¶ 55).  It follows that "use of ACS itself is a law enforcement technique or procedure."  (Third Hardy Decl. ¶ 13).  It also follows that the ACS Basic Reference Guide, which explains how to use ACS to search CRS and identifies "where and how particular sorts of data are recorded within" these proprietary computer systems (First Hardy Decl. ¶ 55), necessarily contains and describes "techniques" or "procedures" used for "law enforcement investigations."  5 U.S.C. § 552(b)(7)(E).

The ACS Basic Reference Guide need not provide step-by-step instructions for potential law-breakers in order to fall within the scope of the exemption; it is enough that it provides "information that could increase the risks that a law will be violated or that past violators will

escape legal consequences." *Mayer Brown*, 562 F.3d at 1193.  The FBI has demonstrated how the release of the ACS Basic Reference Guide might create a risk of circumvention of the law by averring to the possibility that individuals could use it "to gain unauthorized access to, view and manipulate data on, or otherwise interfere with the FBI's system," and that "[s]uch actions could arm individuals with the information or ability to avoid detection or develop countermeasures to circumvent the FBI's ability to effectively use this investigatory tool."  (First Hardy Decl. ¶ 55(a)).  *See also McRae v. U.S. Dep't of Justice*, 869 F. Supp. 2d 151, 168-69 (D.D.C. 2012) (holding that disclosure of information contained in a law enforcement database used to conduct criminal history checks could reasonably be expected to risk circumvention of the law, and was thus protected from disclosure under exemption (b)(7)(E), because, *inter alia*, disclosure of such information to computer literate individuals could provide information on the structure of the system and expose it to circumvention).

Plaintiff's reliance on *Dent v. Exec. Office for U.S. Attys.*, 926 F. Supp. 2d 257 (D.D.C. 2013), is misplaced.  In that case, the court held that the government had not provided enough information to invoke exemption (b)(7)(E), having relied "on a declaration written in vague terms or in a conclusory manner," and which did not actually explain the substance of the records being withheld.  926 F. Supp. 2d at 272.  In this case, while the FBI's declaration does not provide a wealth of information about the ACS Basic Reference Guide (because describing it or ACS in too much detail would identify the information it seeks to protect), it is by no means vague or conclusory.  Instead, Defendant has submitted "evidence from which the Court can deduce something of the nature of the techniques in question."  *Dent*, 926 F. Supp. 2d at 272-73.  For example, the FBI has explained what ACS and CRS are and what the ACS Basic Reference Guide is, and it has provided Plaintiff with the Guide's Table of Contents and Index, which

Plaintiff attached to his opposition.   (*See* Pl. First Opp. Ex. B).   Additionally,  as discussed above,  the FBI has logically demonstrated "how the release of the requested information might create a risk of circumvention of the law."  *Mayer Brown*, 562 F.3d at 1194.  *Dent* is therefore inapposite to the facts of this case.

For these reasons, the court finds that the FBI has provided enough information to support its invocation of exemption (b)(7)(E) with regard to the withheld portions of the ACS Basic Reference Guide, and Defendant's motion for summary judgment on Count II is therefore granted.

### c.   Count III (Civil Division Monographs)

The FOIA request at issue in Count III seeks from the Civil Division copies of three specific monographs totaling 166 pages: *Chevron Notes* (2009), which is 18 pages; *The Governmental Privileges* (September 2006), which is 119 pages; and *Defending Actions Brought Pursuant to the Privacy Act of 1974* (1982), which is 29 pages. (Kovakas Decl. Ex. A; *id.* ¶ 5). The Civil Division asserts that all three monographs were withheld in full pursuant to FOIA exemption (b)(5) because they "were created for the specific purpose of providing legal guidance to federal attorneys and were not intended for public disclosure." (*Id.* ¶ 5).

In support of its invocation of exemption (b)(5), the Civil Division states that none of the monographs have been "disclosed outside the federal executive branch," that all three monographs provide specific guidance and legal analysis applicable to various cases handled by Civil Division attorneys on a regular and recurring basis and that the use of this analysis by government attorneys "is so detailed that it becomes part of the attorney work product and deliberative process in these cases." (*Id.* ¶¶ 7-8, 10-11, 13-14). Specifically, the Civil Division declares the following:

- *Chevron Notes* outlines and explains in detail "specific steps to be followed by DOJ and other federal attorneys in determining the meaning of federal statutes, generally when a court is called upon to determine whether an agency action is in excess of statutory jurisdiction, authority or limitations," and "sets out guidance for the purpose of gaining a measure of deference from the court to the statutory interpretation of the agency that has been delegated to administer the statute" (*id.* ¶ 6);

- *Governmental Privileges* sets out the "legal reasoning necessary to assist government attorneys in assessing the propriety of asserting privileges available to the government and memorializes the procedures that must be followed in accordance with DOJ policies" (*id.* ¶ 12); and

- *Defending Actions Brought Pursuant to the Privacy Act of 1974* ("*Defending Actions*") "outlin[es] the specific legal requirements of the Privacy Act," "identifies case law supporting various legal interpretations of the statute" and "outlines specific defenses to be used by government attorneys when certain subsections of the [statute] are asserted against federal agencies" (*id.* ¶ 9).

The Civil Division also declares that releasing the contents of these monographs could unfairly disadvantage government attorneys by disclosing their deliberations, legal tactics and legal reasoning. (*See id.* ¶¶ 7, 10, 13).

Plaintiff argues that neither the attorney work product doctrine nor the deliberative process privilege apply.[3]  The question for the court to decide on Defendant's motion for

---

[3] Plaintiff seizes on the use of the word "potentially" in paragraphs 7 and 10 of the Kovakas Declaration to argue that the attorney work product and deliberative process privileges are inapplicable. Specifically, these two paragraphs state that disclosure of the *Chevron Overview* and *Defending Actions* monographs "would unfairly disadvantage government attorneys by potentially disclosing their deliberations, legal tactics and legal reasoning in support of their client agencies." (Kovakas Decl. ¶¶ 7, 10). Plaintiff cites *Maydak v. DOJ*, 218 F.3d 760, 765 (D.C. Cir. 2000), which held that withholding was not permitted where an agency stated that certain exemptions "may be applicable." Here, however, the Civil Division contends that exemption (b)(5) *is* applicable and, as discussed in greater detail below, it supplies significantly more support for that contention than the conclusory, "cursory, equivocal, and inconsistent assertions" that the *Maydak* court deemed insufficient. 218 F.3d at 765. Accordingly, the Civil Division's use of the word "potentially" in these two paragraphs, when viewed in the context of the entire Kovakas Declaration, does not render the exemption inapplicable.

Plaintiff also argues that, because the Kovakas Declaration only addresses *Chevron Notes* and *Defending Actions* under the heading "Attorney Work Product Doctrine," and does not discuss *Governmental Privileges* under that heading, the court should not consider the Civil Division to

summary judgment is whether the Civil Division has provided enough information to support its invocation of exemption (b)(5) with regard to these three monographs. Because the court finds, for the reasons set forth below, that the Civil Division has met its burden to establish the applicability of the attorney work product doctrine, it will not address the parties' arguments relating to the deliberative process privilege.

### i. Exemption (b)(5) and the Attorney Work Product Doctrine

FOIA exemption (b)(5) allows agencies to withhold "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). In determining whether a document is properly withheld under this exemption, a court must ensure that the document satisfies two conditions: "its source must be a Government agency, and it must fall within the ambit of a privilege against discovery under judicial standards that would govern litigation against the agency that holds it," including the attorney work product privilege. *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001); *see also NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 149 (1975) (finding it reasonable to construe exemption (b)(5) "to exempt those documents, and only those documents, normally privileged in the civil discovery context"). Because Plaintiff does not contest that the monographs at issue in Count III constitute inter-agency or intra-agency memorandums, the court will focus exclusively on whether the work product privilege applies to them.

---

have asserted work product privilege over *Governmental Privileges*. (Pl. First Opp. at 19 & n.12). Elsewhere in the Declaration, however, the Civil Division describes the legal analysis contained in *Governmental Privileges* as being covered by the work product privilege. (*See* Kovakas Decl. ¶ 13). The court therefore disagrees with Plaintiff's reading.

The attorney work product privilege "should be interpreted broadly and held largely inviolate," *Judicial Watch v. U.S. Dep't of Justice,* 432 F.3d 366, 369 (D.C. Cir. 2005), as "it is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel." *Hickman v. Taylor,* 329 U.S. 495, 510 (1947).   That principle is codified in Federal Rule of Civil Procedure 26(b)(3), which protects from disclosure those "documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative."   For purposes of exemption (b)(5), the test "is whether the documents would be 'routinely' or 'normally' disclosed upon a showing of relevance." *FTC v. Grolier, Inc.*, 462 U.S. 19, 26 (1983) (quoting *Sears,* 421 U.S. at 148-49); *see also Williams & Connolly v. SEC,* 662 F.3d 1240, 1243 (D.C. Cir. 2011) ("Although work product protection may be overcome for cause in civil cases . . . any materials disclosed for cause are not 'routinely' or 'normally' discoverable and, for that reason, are exempt under FOIA.") (citation omitted); *Stonehill v. IRS,* 558 F.3d 534, 539 (D.C. Cir. 2009) ("not all documents available in discovery are also available pursuant to FOIA" since "case-specific exceptions can sometimes permit discovery of otherwise privileged material").

"Any part of [a document] prepared in anticipation of litigation, not just the portions concerning opinions, legal theories, and the like, is protected by the work product doctrine." *Tax Analysts v. IRS,* 117 F.3d 607, 620 (D.C. Cir. 1997).   "Moreover, in the FOIA context, the temporal relationship between the document at issue and the litigation for which the document was prepared is irrelevant." *Shapiro v. U.S. Dep't of Justice*, 969 F. Supp. 2d 18, 29 (D.D.C. 2013), *appeal dismissed*, No. 13-5345, 2014 WL 1378748 (D.C. Cir. Feb. 26, 2014) (citing *Grolier,* 462 U.S. at 28-31).   As the Supreme Court recognized in *Grolier,*

> disclosure of work product connected to prior litigation can cause real harm to the interests of the attorney and his client even after the controversy in the prior

litigation is resolved. Many government agencies, for example, deal with hundreds or thousands of essentially similar cases in which they must decide whether and how to conduct enforcement litigation. Few of these cases will be "related" to each other in the sense of involving the same private parties or arising out of the same set of historical facts; yet large classes of them may present recurring, parallel factual settings and identical legal and policy considerations. It would be of substantial benefit to an opposing party (and of corresponding detriment to an agency) if the party could obtain work product generated by the agency in connection with earlier, similar litigation against other persons. He would get the benefit of the agency's legal and factual research and reasoning, enabling him to litigate on wits borrowed from the adversary. Worse yet, he could gain insight into the agency's general strategic and tactical approach to deciding when suits are brought, how they are conducted, and on what terms they may be settled.

462 U.S. at 30-31 (internal citation omitted).

The privilege is not endless, however, because "[w]hile it may be true that the prospect of future litigation touches virtually any object of [an agency] attorney's attention, if the agency were allowed 'to withhold any document prepared by any person in the Government with a law degree simply because litigation might someday occur, the policies of the FOIA would be largely defeated.'" *Senate of the Com. of Puerto Rico on Behalf of Judiciary Comm. v. U.S. Dep't of Justice*, 823 F.2d 574, 586-87 (D.C. Cir. 1987) (quoting *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 865 (D.C. Cir. 1980)). Thus, "the privilege has no applicability to documents prepared by lawyers 'in the ordinary course of business or for other nonlitigation purposes.'" *In re Sealed Case,* 146 F.3d 881, 887 (D.C. Cir. 1998) (quoting *Linde Thomson Langworthy Kohn & Van Dyke, P.C. v. RTC,* 5 F.3d 1508, 1515 (D.C. Cir. 1993)).

The D.C. Circuit has employed two standards regarding what constitutes "anticipation of litigation." In one line of cases, the Circuit has held that in order for work-product protection to apply, "the documents must at least have been prepared with a specific claim supported by concrete facts which would likely lead to litigation in mind." *Coastal States*, 617 F.2d at 865. In the other line of cases, the Circuit has employed a more lenient standard, extending work-product

protection to "documents prepared in anticipation of foreseeable litigation, even if no specific claim is contemplated." *Schiller*, 964 F.2d at 1208.

The D.C. Circuit reconciled these two lines of cases in *In re Sealed Case*, explaining that the specific-claim requirement only applies when the documents being sought have been prepared "in connection with active investigations of potential wrongdoing" and the attorney who prepared the documents was acting as a prosecutor or investigator. 146 F.3d at 885. By contrast, a more lenient standard applies when the attorney who prepared the documents acted as a "legal advisor" protecting his or her clients "from the possibility of future litigation." *Id.* The Court observed that "[i]t is often prior to the emergence of specific claims that lawyers are best equipped either to help clients avoid litigation or to strengthen available defenses should litigation occur," that "[i]f lawyers had to wait for specific claims to arise before their writings could enjoy work product protection, they would not likely risk taking notes about such matters or communicating in writing with colleagues, thus severely limiting their ability to advise clients effectively," and that applying the specific claim standard to lawyers taking prophylactic measures "would undermine lawyer effectiveness at a particularly critical stage of the legal representation." *Id.* at 886; *see also United States v. ISS Marine Servs., Inc.*, 905 F. Supp. 2d 121, 136 (D.D.C. 2012). Thus, the court need not construe the attorney work product privilege so narrowly as to protect only work product related to specific claims and litigation.

In this case, the Civil Division has sufficiently established that the monographs being sought by Plaintiff were prepared by attorneys in anticipation of litigation, as they outline the legal strategies of attorneys who will be required to litigate on behalf of the government. The Civil Division states that *Chevron Notes* is essentially a playbook on how the government litigates challenges to agency actions, as it sets out "specific steps" for interpreting federal

statutes and provides guidance on how to persuade courts to give deference to those interpretations. (Kovakas Decl. ¶ 6). The Civil Division makes the same assertion for *Governmental Privileges*, which sets out "legal reasoning necessary to assist government attorneys" in asserting government privileges. (*Id.* ¶ 12). And the Civil Division states that *Defending Actions* is essentially a manual for conducting Privacy Act litigation, as it "identifies case law supporting various legal interpretations of the statute" and "outlines specific defenses to be used by government attorneys." (*Id.* ¶ 9). The government is therefore permitted to withhold such records under the attorney work product privilege. *See Delaney, Migdail, & Young, Chartered v. IRS*, 826 F.2d 124, 127 (D.C. Cir. 1987) (documents "advis[ing] the agency of the types of legal challenges likely to be mounted against a proposed program, potential defenses available to the agency, and the likely outcome" are privileged as work product); *Soghoian v. U.S. Dep't of Justice*, 885 F. Supp. 2d 62, 72 (D.D.C. 2012) (citing *Delaney*).

More specifically, the kind of cases, claims and legal arguments to which each of these monographs relate – challenges to agency actions, assertions of governmental privileges and Privacy Act litigation, respectively – all "present recurring, parallel factual settings and identical legal and policy considerations." *Grolier,* 462 U.S. at 30. "It would be of substantial benefit" to a party challenging an agency action, challenging an agency's assertion of a privilege or bringing a claim against an agency under the Privacy Act, "and of corresponding detriment" to the agency, if the party could obtain these monographs, which would give them "the benefit of the agency's legal and factual research and reasoning, enabling [them] to litigate on wits borrowed from" the agency. *Id.* (citation omitted); *see also Shapiro*, 969 F. Supp. 2d at 32 ("The work product doctrine, at its core, is intended to encourage effective legal representation within the

framework of the adversary system by removing counsel's fears that his thoughts and information will be invaded by his adversary.") (quotation omitted).

If not for their potential to be useful to government attorneys in anticipated, foreseeable future litigation, these monographs – none of which have been "disclosed outside the federal executive branch" – would have no practical reason for existing. (Kovakas Decl. ¶¶ 8, 11, 14). Indeed, Plaintiff has not provided any logical reason as to why government attorneys would have prepared these monographs other than for use in foreseeable future litigation. Instead, Plaintiff relies heavily on *Shapiro*, which is distinguishable from this case.

*Shapiro* concerned a "Brief Bank" accessible on DOJ's intranet, which was composed of two broad categories of documents: "court documents" and "summary documents." *Shapiro*, 969 F. Supp. 2d at 24, 35. The court documents included selected filings from FOIA lawsuits and related basic case information. *Id.* at 35. The summary documents included brief summaries of cases and what the author of the summary considered "key issues" in those cases. *Id.*

The court documents within the Brief Bank in *Shapiro* are obviously distinguishable from the monographs at issue here because they were filed in federal courts, which are not agencies, and thus do not meet the exemption's first condition of being either inter- or intra-agency memoranda. *See id.* at 31 (citing 5 U.S.C. § 551(1)(B) (defining "agency" as not including "the courts of the United States")). Moreover, the monographs are not mere compendiums of statutes, court decisions, filed legal briefs or other publicly available information, as was the case in *Shapiro*. The Kovakas Declaration demonstrates that the monographs provide specific legal reasoning and analysis on particular issues that go well beyond what is publicly available. Accordingly, unlike the court documents in the Brief Bank in *Shapiro*, disclosure of the

monographs "would reveal mental processes and strategy to adversaries" that could be used in future litigation. *Shapiro*, 969 F. Supp. 2d at 32.

The "[n]eutral summaries of the legal holdings of cases and the issues they present" at issue in *Shapiro*, which did not "reveal any legal strategy or other case-specific legal considerations that might have implications for future litigation if revealed to adversaries," are also clearly distinguishable. *Id.* at 36-37. The monographs here are much more than neutral summaries. As stated above, they are "veritable 'how to' manuals for building defenses and litigating" challenges to agency actions, assertions of governmental privileges and Privacy Act litigation – precisely the kind of documents "provid[ing] advice to agencies or attorneys about how to conduct legal proceedings on specific anticipated claims" that the *Shapiro* court distinguished as the proper subjects of exemption (b)(5) withholdings in its discussion of *Schiller* and *Delaney*. *Id.*

For the reasons set forth above, the court finds that the Civil Division has provided enough information to support its invocation of exemption (b)(5) with regard to the *Chevron Notes*, *Governmental Privileges* and *Defending Actions* monographs. The court therefore grants Defendant's motion for summary judgment on Count III.

### d.  Count IV (Executive Office Records from USABook Desktop Library)

The FOIA request at issue in Count IV seeks from the Executive Office all records in the USABook Desktop Library maintained by the Office of Legal Education indexed under the topic "Freedom of Information." (Luczynski Decl. Ex. A; Compl. ¶ 37). The Office of Legal Education maintains a non-public computer site called USABook, which hosts electronic copies of, among other things, training materials and publications available to DOJ attorneys and staff.

(Luczynski Decl. ¶ 15).  USABook "is not a publication, but a collection of 'chapters' of written

text, including at times certain hyperlinks inserted into the text." (*Id.*).

"The USABook Library site includes approximately 650 'Topic Pages,' (or Chapters),

each bearing the name of a legal topic." (*Id.* ¶ 16).

> A USABook topic page will always include a list of links (which may go to
> documents on the USABook site, documents on the Internet, documents on other
> intranet sites, or to commercial publications, as described above).  It may include
> a concise legal note defining the topic, and include a note, including contact
> information, about DOJ sections that have supervisory responsibility over the
> subject matter.  Sometimes the definition section will be several paragraphs long,
> breaking the topic down and alerting attorneys to issues or new federal cases that
> they need to be careful about.  The purpose of each page is to orient DOJ
> attorneys on sometimes complex legal issues, and tell them where to go for
> further research, and who to contact for advice.  These notes are informal, and are
> not subject to formal review by the DOJ sections with supervisory jurisdiction.

(Hagen Decl. ¶ 9).  Notably, links to documents that are not themselves hosted on the USABook

site are sometimes included on USABook Topic Pages because "[t]here is no practical reason,

from the users' point of view, to distinguish these publications from the ones that are actually

hosted on USABook." (*Id.* ¶ 8).

Counsel for Defendant provided Plaintiff with a redacted copy of what the Executive

Office refers to as the "FOIA Topic Page" in September 2013.  (Luczynski Decl. ¶¶ 10-11).  The

FOIA Topic Page does "not contain a legal note or similar text"; it is "just a list of links."  (Hagen

Decl. ¶¶ 18-19).  There are a total of 23 links that have *not* been redacted from the FOIA Topic

Page that was provided to Plaintiff.  (Luczynski Decl. Ex. D).  The Executive Office determined

that 12 of the 23 unredacted links were "to public documents that are posted on the Internet."

(Hagen Decl. ¶ 20).  As such, it determined that the content "behind" those 12 links was not

responsive to Plaintiff's request, which sought only non-public records. (Luczynski Decl. Ex. A).

The FOIA Topic Page thus contained 11 unredacted links "to non-public documents." (Hagen Decl. ¶ 21).[4]

Material was also redacted from the FOIA Topic Page under the heading "USAM REFERENCES," with the redaction marked as "Public Records." (Luczynski Decl. Ex. D). This section of the Topic Page contained references to the United States Attorneys' Manual, which is a public document, and thus not responsive to Plaintiff's request. (Hagen Decl. ¶ 22). Material marked as "N/R" – presumably for "Non-Responsive" or "Not Requested" – is also redacted from the FOIA Topic Page under the heading "Training," next to which are eight unredacted camcorder icons which seem to indicate that links to eight different training videos have been redacted. (Luczynski Decl. Ex. D).

### i. The Executive Office's Reading of Plaintiff's FOIA Request

The Executive Office takes the position that content to which the FOIA Topic Page links is only responsive to Plaintiff's FOIA request where *the content itself* is actually located on the USABook site. (*See, e.g.*, Luczynski Decl. ¶ 18; Hagen Decl. ¶¶ 21-22). Thus, for example, it argues that "[t]he FOIA and local discovery policies (EOUSA October 13, 2010) . . . document resides on USANet, EOUSA's intranet, and not on the USABook site, so it was not responsive to the request"; that the "Criminal Practice Manual §§ 21:1-21:50 is . . . not on USABook, so it is not responsive to the request," and that "the Training Videos were not on the USABook site (and consequently not requested)." (Hagen Decl. ¶¶ 21-22). Accordingly, the Executive Office only

---

[4] The 11 unredacted links to non-public documents on the FOIA Topic Page are as follows: "FOIA Litigation (Civil Practice Manual)"; "FOIA and local discovery policies (EOUSA October 13, 2010)"; "United States Attorneys' Administrative Handbook (FOIA Q&A)"; "Privileges"; "Deliberative Process Privilege"; "Governmental Privileges"; "Touhy Regulations"; "Investigative Files Privilege"; "Privacy (Privacy Act)"; "Wiretap recordings"; and *Criminal Practice Manual §§ 21:1-21:50*." (Luczynski Decl. Ex. D).

considered the content "behind" four of the 11 unredacted links to non-public documents on the FOIA Topic Page to be responsive to Plaintiff's request – specifically, the content "behind" the links for "FOIA Litigation (Civil Practice Manual)," "United States Attorneys' Administrative Handbook (FOIA Q&A)," "Privacy (Privacy Act)" and "Wiretap recordings." (Luczynski Decl. ¶ 17; Hagen Decl. ¶ 21).

Plaintiff contends that the Executive Office construed his request too narrowly. He argues that in requesting "all records in the USABook Desktop Library . . . indexed in the USABook List of Topics by the topic 'Freedom of Information'" (Luczynski Decl. Ex. A), he in effect requested the FOIA Topic Page, even though he did not refer to it by that name. Thus, Plaintiff asserts that the Executive Office should have simply processed everything that was on the FOIA Topic Page rather than constructing an "unnecessarily convoluted" definition of what would be responsive – *i.e.*, only the content to which the FOIA Topic Page links that is actually located on the USABook site. (Pl. Second Opp. at 11-12).

The court agrees with Plaintiff that the Executive Office applied an unnecessarily hypertechnical reading to his request, and that its method of processing only those documents "behind" links on the FOIA Topic Page which are themselves located on the USABook site was inappropriate. *See Iturralde v. Comptroller of Currency*, 315 F.3d 311, 315 (D.C. Cir. 2003) ("[T]he adequacy of a FOIA search is generally determined . . . by the appropriateness of the methods used to carry out the search."). The court therefore agrees with Plaintiff that a "reasonable, simple, liberal construction of [his] request includes 'the FOIA Topic Page' and whatever is on it, and if it includes a page of links, whatever is behind those links is also responsive." (Pl. Second Opp. at 12). *See generally, Morley v. CIA*, 508 F.3d 1108, 1114 (D.C. Cir. 2007) (when an agency receives a request that "reasonably describes" the records sought, it

must carry out "a search reasonably calculated to uncover all relevant documents") (internal

quotation omitted); *Nat'l Sec. Counselors v. CIA*, 849 F.Supp.2d 6, 12 (D.D.C. 2012) ("[A]n

agency is not permitted to deny requesters information by narrowing the scope of its search to

exclude relevant information."); *Hemenway v. Hughes*, 601 F. Supp. 1002, 1005 (D.D.C. 1985)

("[An] agency must be careful not to read the request so strictly that the requester is denied

information the agency well knows exists in its files, albeit in a different form from that

anticipated by the requester. To conclude otherwise would frustrate the central purpose of the

Act.").

　　　　The court's finding is reinforced by the Executive Office's own statement that USABook

Topic Pages contain links to documents which are not themselves hosted on the USABook site

because "[t]here is no practical reason, from the users' point of view, to distinguish these

publications from the ones that are actually hosted on USABook." (Hagen Decl. ¶ 8.). If there is

no practical reason to distinguish between these two classes of documents from a user's point of

view, there should be no practical reason to distinguish between them from a FOIA requester's

point of view.

　　　　Accordingly, summary judgment is denied as to Count IV, and Defendant is hereby

ordered to provide to Plaintiff a fully unredacted copy of the USABook FOIA Topic Page (*see*

Luczynski Decl. Ex. D), as well as any and all non-exempt, not publicly available documents and

records "behind" the links listed on the unredacted FOIA Topic Page. Defendant shall also

provide to Plaintiff a *Vaughn* index listing all documents "behind" any of the unredacted FOIA

Topic Page's links that it is withholding pursuant to any FOIA exemptions. The *Vaughn* index

shall also identify which links on the FOIA Topic Page link to publicly available material. Thus,

every link on the unredacted FOIA Topic Page should be accounted for on the *Vaughn* index as

being either (i) provided in full to Plaintiff; (ii) publicly available; or (iii) withheld in full or in part pursuant to a FOIA exemption, with sufficient explanation of the asserted exemption.

There remains to be decided the issue of those links on the FOIA Topic Page that lead to other Topic Pages which are themselves simply lists of links.  The D.C. Circuit has long held that "mere reference to other files does not establish the existence of documents that are relevant to" a FOIA request because, "[i]f that were the case, an agency responding to FOIA requests might be forced to examine virtually every document in its files, following an interminable trail of cross-referenced documents like a chain letter winding its way through the mail."  *Steinberg v. Dep't of Justice*, 23 F.3d 548, 552 (D.C. Cir. 1994).  Accordingly, for any link on the FOIA Topic Page that leads to another list of links on another Topic Page, Defendant is hereby ordered to list the links on the cross-referenced Topic Page on its *Vaughn* index, but it need not fully process the content that is "behind" those links at this time.  To the extent that Defendant believes that the mere text of any link or list of links on a cross-referenced Topic Page is exempt under FOIA, it should provide sufficient explanation of the asserted exemption on its *Vaughn* index.

   e. Count V (FBI Records regarding Christopher Hitchens)

The FOIA request at issue in Count V seeks from the FBI all records, including cross-references, regarding Christopher Hitchens.  (Fourth Hardy Decl. Ex. A).  The FBI initially released to Plaintiff 19 pages of material previously processed for another requester, with certain information exempted pursuant to FOIA exemptions (b)(1), (b)(6), (b)(7)(C), (b)(7)(D) and (b)(7)(E).  (*Id.* ¶ 8).  After OIP remanded Plaintiff's request back to the FBI, it reviewed 65 pages of records and released 42 of those pages to Plaintiff in full or in part, with certain information exempted pursuant to the same FOIA exemptions, as well as exemption (b)(3).  (*Id.* ¶ 13).  In the instant action, Plaintiff does not challenge the adequacy of the FBI's search and

only challenges its assertion of exemption (b)(7)(D), which the FBI asserted with regard to parts of 29 pages of records. (*Id.* ¶¶ 99-100 n.21-22).

The FBI's records about Hitchens were compiled as part of government background investigations related to his applications for permanent resident status and for a White House press pass. (*Id.* ¶ 82(a)). According to the FBI, as part of its background investigation process, it "conducts searches of its criminal and national security/intelligence files to locate any pertinent information in its possession about the applicant. Any pertinent criminal or national security intelligence information located as a result of such queries is re-compiled into the background investigation file." (Fifth Hardy Decl. ¶ 8).

In Hitchens' case, the Secret Service and Immigration and Naturalization Service asked the FBI to search its investigative files as part of those agencies' processing of his applications. (*Id.* ¶ 9). During this process, certain "information about Hitchens [that] was originally compiled by a foreign intelligence/national security agency in furtherance of investigative/intelligence activities that it had undertaken in furtherance of its national security" was shared with the FBI, which then re-compiled that information into the background investigation files. (*Id.* ¶ 10). Additionally, information about Hitchens was re-compiled from a document originally compiled "from information provided by a foreign government agency to the FBI in furtherance of an international terrorism investigation of a third party being conducted by the FBI." (*Id.* ¶ 11). Other information was re-compiled from information "provided by a third party to the FBI and/or law enforcement officials during the course of law enforcement investigations." (Fourth Hardy Decl. ¶ 100 & n.22).

The FBI also represents that 28 of the 29 pages of records about Hitchens that it withheld pursuant to exemption (b)(7)(D) were based on information provided to it "by an intelligence agency of a foreign government with an implicit understanding of confidentiality":

> The FBI, in connection with a wide variety of criminal and national security investigations, solicits and receives information regularly from state, local, and foreign agencies and authorities. Inherent in this cooperative effort is a mutual understanding that the identity of such a source and the information provided by it will be held in confidence by the FBI, and not released pursuant to FOIA and Privacy Act requests. We determined that the information provided here by a foreign intelligence agency was part of a cooperative effort supporting an inference of confidentiality.

(Fourth Hardy Decl. ¶ 99 & n.21). Additionally, one page withheld pursuant to exemption (b)(7)(D) was

> provided by a third party to the FBI and/or law enforcement officials during the course of law enforcement investigations under an express grant of confidentiality. The FBI and/or law enforcement officials expressly promised this source that his/her identity and the information he/she provided would not be disclosed.

(*Id.* ¶ 100 & n.22). The FBI also withheld "the confidential source file number" of this confidential source. (*Id.* ¶ 101 & n.23).

### i. Exemption (b)(7)(D)

Exemption (b)(7)(D) exempts from disclosure under FOIA "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . could reasonably be expected to disclose the identity of a confidential source, including a State, local, or foreign agency or authority or any private institution which furnished information on a confidential basis, and, in the case of a record or information compiled by [a] criminal law enforcement authority in the course of a criminal investigation or by an agency conducting a lawful national security intelligence investigation, information furnished by a confidential source." 5 U.S.C. § 552(b)(7)(D). The exemption thus "protects two distinct types of information: (1) information [that] 'could reasonably be expected

to disclose the identity of a confidential source'; and (2) 'information furnished by a confidential source.'" *Cobar v. U.S. Dep't of Justice*, 81 F. Supp. 3d 64, 72 (D.D.C. 2015) (quoting 5 U.S.C. § 552(b)(7)(D)). Here, Plaintiff seeks only the information provided by confidential sources; he does not seek the identities of those sources.

To establish that its withholding of information under exemption (b)(7)(D) was permissible, Defendant must establish two things. First, that the records were "compiled by [a] criminal law enforcement authority in the course of a criminal investigation or by an agency conducting a lawful national security intelligence investigation." 5 U.S.C. § 552(b)(7)(D). Second, that the source of the records or information was actually a confidential source – *i.e.*, that "the particular *source* spoke with an understanding that the communication would remain confidential." *United States Dep't of Justice v. Landano*, 508 U.S. 165, 172 (1993). Such an understanding is reasonable when the law enforcement agency receiving the information provides either an express or implied assurance of confidentiality. *See id.* ("[A] source is confidential within the meaning of Exemption 7(D) if the source provided information under an express assurance of confidentiality or in circumstances from which such an assurance could be reasonably inferred.") (citation and quotation omitted).

With regard to the first requirement, Plaintiff argues that the FBI's files on Hitchens were not compiled as part of a criminal or national security investigation because FBI background investigations do not constitute criminal or national security investigations. As Defendant points out in its reply brief, however, the records for which the FBI asserts exemption (b)(7)(D) are composed of information that was *originally* "compiled by a foreign intelligence/national security agency in furtherance of investigative/intelligence activities that it had undertaken in furtherance of its national security" (Fifth Hardy Decl. ¶ 10), "provided by a foreign government agency to

the FBI in furtherance of an international terrorism investigation of a third party being conducted by the FBI" (*id.* ¶ 11), and "provided by a third party to the FBI and/or law enforcement officials during the course of law enforcement investigations." (Fourth Hardy Decl. ¶ 100). The FBI then re-compiled this information as part of its background investigations related to Hitchens' applications for permanent resident status and a White House press pass. (*Id.* ¶ 82(a)).

The Supreme Court has held that "information initially contained in a record made for law enforcement purposes continues to meet the threshold requirements of [exemption (b)(7)] where that recorded information is reproduced or summarized in a new document prepared for a non-law-enforcement purpose." *F.B.I. v. Abramson*, 456 U.S. 615, 631-32 (1982); *see also Dismukes v. Dep't of Interior*, 603 F. Supp. 760, 761 (D.D.C. 1984) (noting that *Abramson*'s holding "focused on the *information*, not the form in which it was presented, even though [exemption (b)(7)] by its terms covers only certain 'investigatory records compiled for law enforcement purposes'"). Thus, because the FBI has demonstrated that the 29 pages of records over which it asserts exemption (b)(7)(D) were all originally compiled for law enforcement purposes, those records remain protected by the exemption even if the background checks for which they were re-compiled do not constitute "law enforcement purposes," so long as the FBI can make the requisite showing on the second prong of the test – *i.e.*, that the information was provided under an express or implied assurance of confidentiality.

As to that second prong, the FBI states that 28 pages of records about Hitchens contain information provided "by an intelligence agency of a foreign government with an implicit understanding of confidentiality." (Fourth Hardy Decl. ¶ 99 & n.21). When an implicit or implied assurance of confidentiality is asserted, the proper inquiry is "whether the particular source spoke with an understanding that the communication would remain confidential."

*Landano*, 508 U.S. at 172.  While the court is mindful that there may be circumstances in which an implied assurance of confidentiality can be inferred from the context and surroundings in which the information was imparted, the FBI has not provided the court with enough evidence to permit it to draw such an inference here.  Instead, the FBI's declaration speaks primarily in vague generalities about how it cooperatively "solicits and receives information regularly from state, local, and foreign agencies and authorities," and how "a mutual understanding" regarding confidentiality is "[i]nherent in this cooperative effort." (Fourth Hardy Decl. ¶ 99).  The only statement that the FBI makes about the implied assurance of confidentiality purportedly made with regard to these specific 28 pages of records, however, is an entirely conclusory recitation of the burden it must meet: "We determined that the information provided here by a foreign intelligence agency was part of a cooperative effort supporting an inference of confidentiality." (*Id.*).  This is not sufficient.

As to the one page of information regarding Hitchens that was provided by a permanent confidential source of the FBI who was purportedly operating under an express assurance of confidentiality, in order to withhold information under exemption (b)(7)(D) by an express assurance of confidentiality, "the FBI must present probative evidence that the source did in fact receive an express grant of confidentiality."  *Campbell v. U.S. Dep't of Justice*, 164 F.3d 20, 34 (D.C. Cir. 1998), *as amended* (Mar. 3, 1999) (quotation omitted).  "Such evidence can take a wide variety of forms, including notations on the face of a withheld document, the personal knowledge of an official familiar with the source, a statement by the source, or contemporaneous documents discussing practices or policies for dealing with the source or similarly situated sources." *Id.* (citing, *inter alia*, *Computer Prof'ls for Soc. Responsibility v. U.S. Secret Serv.*, 72 F.3d 897, 906 (D.C. Cir. 1996), *amended* (Feb. 20, 1996)).  "No matter which method the agency adopts to meet

its burden of proof, its declarations must permit meaningful judicial review by providing a sufficiently detailed explanation of the basis for the agency's conclusion" that there was an express assurance of confidentiality. *Id.* This is because "[o]nce the FBI asserts that information was provided by a confidential source . . . the requester – who has no knowledge about the particular source or the information being withheld – very rarely will be in a position to offer persuasive evidence that the source in fact had no interest in confidentiality." *Landano*, 508 U.S. at 177.

The FBI states that the confidential source here "provided detailed information that is singular in nature concerning the activities of certain subjects of investigative interest to the FBI and/or other law enforcement agencies," and that "disclosure of the source's identity and the information he/she provided could have disastrous consequences because disclosure could subject the source, as well as his/her family, to embarrassment, humiliation, and/or physical or mental harm." (Fourth Hardy Decl. ¶ 100). The FBI states that it withheld this source's confidential source file number, and explains that such numbers "are administrative tools that facilitate the retrieval of information supplied by a source" and are "[s]imilar in usage to the confidential source symbol number, [in that a] confidential source file number is assigned in sequential order to confidential informants who report information to the FBI on a regular basis pursuant to an express assurance of confidentiality." (*Id.* ¶ 101). The FBI also represents that a confidential source file number "is unique to the particular confidential informant and is used only in documentation relating to that particular informant." (*Id.*).

Given the FBI's fairly in-depth explanation of its confidential source number system, and in light of the fact that Plaintiff has not challenged the information provided by the FBI showing that the source provided information under an express assurance of confidentiality, the court

concludes that the FBI has sufficiently established the existence of an express assurance of confidentiality. *See Roth v. U.S. Dep't of Justice*, 642 F.3d 1161, 1185 (D.C. Cir. 2011) ("[T]he FBI explains in its *Vaughn* index that it assigns permanent source symbol numbers . . . to confidential informants who report information to the FBI on a regular basis pursuant to an 'express' assurance of confidentiality. Given that Roth fails to directly challenge this statement on appeal, we conclude that the FBI has borne its burden of proving that it provided an express assurance of confidentiality to the source-symbol-number informants mentioned in the in camera documents.") (citing *Mays v. Drug Enforcement Admin.*, 234 F.3d 1324, 1328-29 (D.C. Cir. 2000) (upholding withholding of information furnished by a "coded informant" based on an affidavit "describ[ing] the DEA's standard practice of identifying confidential informants" with such codes)); *Labow v. U.S. Dep't of Justice*, 66 F. Supp. 3d 104, 124 (D.D.C. 2014) ("Here, the FBI has met its burden by showing that it provided an express assurance of confidentiality to the source symbol number informants.").

Accordingly, the court holds that the FBI properly withheld information pursuant to exemption (b)(7)(D) on the one page for which it asserted an express assurance of confidentiality, and grants summary judgment in Defendant's favor with respect to the withholding of information on that one page. The court further holds that the FBI has not met its burden of establishing that it properly withheld information pursuant to exemption (b)(7)(D) on the 28 pages of records for which it asserted an implied assurance of confidentiality, and denies Defendant's motion for summary judgment with respect to the withholding of information on those 28 pages. Defendant is hereby ordered to provide to Plaintiff a *Vaughn* index providing sufficient explanation for its assertion that an implied assurance of confidentiality permits the withholding of information on these 28 pages pursuant to exemption (b)(7)(D).

f.   Count VI (FBI Records regarding Gwyneth Todd)[5]

The FOIA request at issue in Count VI seeks from the FBI all of its records regarding

Gwyneth Todd, who was a co-requester along with Plaintiff but is not a party to this action.

(Fourth Hardy Decl. Ex. G).  The requesters specifically sought all FBI records about the events

described in a March 2, 2011 Sydney Morning Herald article they cited in their FOIA request.[6]

Plaintiff and Todd provided a privacy waiver form signed by Todd, which authorized the FBI to

release information about her to both Plaintiff and his counsel, and requested a fee waiver on the

grounds that "the information sought would contribute to the public's understanding of

government operations and activities" because the alleged incident was "of great importance to

the public, especially the facts around William Spencer's impersonation of a State Department

employee."  (Fourth Hardy Decl. ¶ 14, Ex. G; Compl. ¶ 54).

In November 2013, the FBI informed Plaintiff that it had located approximately 10,000

pages of potentially responsive material.  (Fourth Hardy Decl. ¶ 17 (citing Ex. I thereto)).[7]

Pursuant to 28 C.F.R. § 16.11, plaintiff was advised that the estimated fee associated with his

FOIA request was $290.00, which exceeded $250.00; therefore, the FBI requested partial

---

[5] The court will permit Plaintiff to incorporate by reference his Motion for a Preliminary
Injunction (ECF No. 18) and his Reply in support of that Motion (ECF No. 23).  The court will
also permit Defendant to incorporate by reference its opposition to Plaintiff's Motion for a
Preliminary Injunction (ECF No. 22).

[6] The article states that an undercover FBI agent named William Spencer visited Todd's
Canberra, Australia home and gained entry under the false pretense that he was "US embassy
consular officer Bill Phelps," who was warning local Americans about an incident involving
Chinese hackers.  According to the article, the same individual returned to Todd's house the
following day and, after being challenged, admitted that he was an FBI agent who wanted to talk
to her about an investigation into her former partner.

[7] The FBI also sent a separate letter to Todd in response to the request.  Because Todd is not a
party to this action, the court does not consider this letter to be a part of the administrative record
applicable to the fee waiver denial now before it.

advance payment of $72.50 within thirty days. (*Id.*). Plaintiff was also advised that he could consider reducing the scope of his request to accelerate the processing and potentially reduce the fees associated with his request. (*Id.*). The letter also advised him that his request for a fee waiver had been denied:

> We have reviewed the information that you provided in support of your request for a fee waiver and have found that you do not satisfy either requirement because disclosure of the requested information would not be of interest to the public as this was not a widely known incident within the United States and would not significantly contribute to the "public understanding of government operations or activities." Additionally, the commercial interest to the requester is sufficiently larger than the public interest in the disclosure of this information.

(Fourth Hardy Decl. Ex. I). Because Plaintiff never provided the requested advance payment, the FBI eventually closed his request.

Before closing his request however, the FBI reviewed one file consisting of 174 pages, and released non-exempt information on 147 of those pages to Plaintiff at no cost. (Fourth Hardy Decl. ¶ 18 n.2).[8] In the same correspondence, the FBI also reminded Plaintiff that it had denied his request for a fee waiver, noted his failure to send partial advance payment and informed him that he could file an appeal of the administrative closure of his request with OIP within 60 days. (Fourth Hardy Decl. Ex. J).

### i. *Plaintiff's Entitlement to a Fee Waiver*

Under FOIA, agencies are permitted to charge a reasonable fee for searching, copying and reviewing their files. *See* 5 U.S.C. § 552(a)(4)(A)(ii). Fees are to be reduced or waived if

---

[8] Plaintiff argues that these documents "are almost twenty years old and fall far outside the temporal scope of this request," which he limited to post-2006 records. (Pl Mot. at 8-9 & n.4). But Plaintiff limited the scope of his request more than one year after initially making that request, and the FBI explains that by the time Plaintiff's counsel informed the agency that he was limiting the scope of the request, the FBI had already completed processing the 174-page file. (Second Hardy Decl. ¶ 15).

disclosure of the requested information satisfies a two-prong fee waiver test: the information (i) must be "in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of government," and (ii) must not be "primarily in the commercial interest of the requester." *Id.* § 552(a)(4)(A)(iii).

DOJ has promulgated guidelines for determining how FOIA requests will be processed and how fees will be assessed or waived. *See* 28 C.F.R. § 16.11. For a request to be in the "public interest," four criteria must be met: "(1) the request must concern the operations or activities of government; (2) the disclosure must be 'likely to contribute' to an understanding of government operations or activities; (3) disclosure must contribute to an understanding of the subject by the public at large; and (4) disclosure must be likely to contribute significantly to such public understanding." *Judicial Watch, Inc. v. Dep't of Justice*, 365 F.3d 1108, 1126 (D.C. Cir. 2004) (citing 28 C.F.R. § 16.11(k)(2)). The requester bears the burden of satisfying the public interest standard. *See Larson v. CIA*, 843 F.2d 1481, 1483 (D.C. Cir. 1988).

In any action regarding a fee waiver, a district court must determine the matter *de novo*, and "the court's review of the matter shall be limited to the record before the agency." 5 U.S.C. § 552(a)(4)(A)(vii). Thus, in assessing whether Plaintiff met his burden of satisfying the public interest prong of the fee waiver test, the court's review is limited to Plaintiff's FOIA request letter (Fourth Hardy Decl. Ex. G), the FBI's response thereto (*id.* Ex. I) and the Sydney Morning Herald article to which Plaintiff's FOIA request letter linked.[9]

In support of his request for a fee waiver, Plaintiff simply stated that "[t]here can be no question that the information sought would contribute to the public's understanding of

---

[9] Plaintiff's argument that the court may take judicial notice of materials that were not before the FBI when it denied Plaintiff's fee waiver request – which cites no contextually relevant case law for that proposition – is entirely unpersuasive.

government operations or activities and is in the public interest" because "[t]he events described [in the article] are of great importance to the public, especially the facts around William Spencer's impersonation of a State Department employee." (Fourth Hardy Decl. Ex. G). This conclusory statement, without more, is insufficient to support a fee waiver request. *See, e.g.*, *Judicial Watch, Inc. v. Rossotti*, 326 F.3d 1309, 1312 (D.C. Cir. 2003) (fee waiver requests "must be made with reasonable specificity . . . and based on more than conclusory allegations") (quotation marks and internal citations omitted); *Oglesby v. U.S. Dep't of Army*, 920 F.2d 57, 66 n. 11 (D.C. Cir. 1990) (determining that requester's statement that "[t]he information requested is beneficial to the public interest," was conclusory and insufficient to support a fee waiver); *Edmonds Institute v. U.S. Dep't of Interior*, 460 F. Supp. 2d 63, 73-74 (D.D.C. 2006) (noting that the requester's statement that the request will "give the public substantial, new information concerning the functions undertaken by the [agency] and its agency subdivisions" represented the "type of overly general, conclusory justification that does not support a fee waiver"). Therefore, the court finds that Plaintiff did not meet his burden of demonstrating that the release of the requested records and information would be "in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of government." *Id.* § 552(a)(4)(A)(iii).

Because the court has found that Plaintiff has not satisfied the first prong of the fee waiver test, it need not evaluate his arguments under the second prong of the test, which is satisfied by a showing that the requested information "is not primarily in the commercial interest of the requester." 5 U.S.C. § 552(a)(4)(A)(iii). Accordingly, the court concludes that Defendant is

entitled to summary judgment on Plaintiff's challenge to its fee waiver determination in Count VI.[10]

## IV.    CONCLUSION

For the foregoing reasons, summary judgment is GRANTED on Counts I, II, III and VI; summary judgment is DENIED on Count IV; and summary judgment is GRANTED IN PART and DENIED IN PART on Count V. An appropriate Order accompanies this Memorandum Opinion.


Date:  September 30, 2015


*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge

---

[10] Defendant also argues that Count VI should be dismissed for failure to exhaust administrative remedies pursuant to Federal Rule of Civil Procedure 12(b)(6). This argument is without merit. Under FOIA, when an agency fails to respond to a request within twenty working days, a requester "shall be deemed to have exhausted his administrative remedies with respect to such request," 5 U.S.C. § 552(a)(6)(C), and may therefore immediately seek judicial review in federal district court. *See, e.g., Rossotti*, 326 F.3d at 1310 ("A requester is considered to have constructively exhausted administrative remedies and may seek judicial review immediately if . . . the agency fails to answer the request within twenty days."). Here, Plaintiff submitted his FOIA request in May 2012 and Plaintiff commenced this action nearly one year later, on April 26, 2013, which was more than six months before the FBI substantively responded to the request on November 12, 2013. (*See* Fourth Hardy Decl. ¶¶ 14-17). Plaintiff therefore constructively exhausted his administrative remedies before filing suit.