IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JEFFREY STEIN,

　　Plaintiff,

　　　　　v.

DEPARTMENT OF JUSTICE,

　　Defendant.

Civ. A. No. 1:13-cv-00571

## DECLARATION OF AMIE MARIE NAPIER

I, Amie Marie Napier, declare as follows:

1.　　I am the Section Chief of the Record/Information Dissemination Section (RIDS), Information Management Division, Federal Bureau of Investigation (FBI), located in Winchester, Virginia. I joined the FBI in April 2009, and prior to my current position, I was the Unit Chief of the Office of Internal Auditing's National Security Unit from July 2024 until September 2025; a Unit Chief, Acting Assistant Section Chief, and Acting Section Chief in the Information Technology Infrastructure Division from February 2020 to July 2024; an Auditor, Unit Chief, Assistant Section Chief, and Acting Section Chief in the Training Division from July 2012 to February 2020; an Auditor and Division Compliance Officer in the Security Division from September 2010 to July 2012; and an Auditor and Compliance Team Lead in the Threat Screening Center from April 2009 to September 2010. Prior to joining the FBI, I served as an Auditor with the Department of Defense's Office of Inspector General from September 2003 to April 2009.

1

2.      In my official capacity as Section Chief of RIDS, I supervise approximately 212

FBI employees, supported by approximately 92 contractors, who staff a total of eight Federal

Bureau of Investigation Headquarters units and two field operational service center units. RIDS'

collective mission is to effectively plan, develop, direct, and manage responses to requests for

access to FBI records and information pursuant to the Freedom of Information Act (FOIA), 5

U.S.C. § 552, as amended by the OPEN Government Act of 2007, the OPEN FOIA Act of 2009,

and the FOIA Improvement Act of 2016; the Privacy Act of 1974, 5 U.S.C. § 552a; Executive

Order 13526; Presidential, Attorney General, and FBI policies and procedures; judicial

decisions; and Presidential and Congressional directives. My responsibilities also include the

review of FBI information for classification purposes as mandated by Executive Order 13526, 75

Fed. Reg. 707 (Jan. 5, 2010) and the preparation of declarations in support of Exemption 1

claims asserted by the FBI under the FOIA. The Section Chief, RIDS, has been designated by the

Attorney General of the United States as an original classification authority and a

declassification authority pursuant to Executive Order 13526, §§ 1.3 and 3.1, respectively. The

statements contained in this declaration are based upon my personal knowledge, including

information provided to me in my official capacity, and upon conclusions and determinations

reached and made in accordance therewith.

3.      Because of the nature of my official duties, I am familiar with the procedures

followed by the FBI in responding to requests for information from its files pursuant to the

provisions of the FOIA and the Privacy Act of 1974. Specifically, I am familiar with the FBI's

handling of Plaintiff's FOIA request to FBIHQ, seeking access to records concerning Gwenyth

Todd (Count 6).

4.      This is my first declaration, and the twelfth overall in this case, and incorporates and supplements the prior eleven declarations. *See* Dkt. No. 14-1 ("First Hardy Decl."); Dkt. No. 22-1 ("Second Hardy Decl."); Dkt. No. 27-1 ("Third Hardy Decl."); Dkt. No. 29-1 ("Fourth Hardy Decl."); Dkt. No. 40-2 ("Fifth Hardy Decl."); Dkt. No. 47-1 ("Sixth Hardy Decl."); Dkt. No. 50-2 ("Seventh Hardy Decl."); Dkt. No. 70-1 ("Eighth Hardy Decl."); Dkt. No. 109-1 ("Ninth Hardy Decl."); Dkt. No. 122-1, ("First Seidel Decl."); and Dkt. No. 141-1, ("Second Seidel Decl.").

5.      The FBI processed 7,004 pages of records responsive to Plaintiff's request concerning Gwenyth Todd (Count 6). In an effort to resolve this matter, Plaintiff provided the FBI seven criteria for the FBI to research. The FBI performed the requested research and is now briefing only a sample of responsive material for Count 6. The sample consists of 2,537 pages of records that met the criteria from Plaintiff as well as context pages provided by the FBI in its October 5, 2018 supplemental release. Plaintiff conceded the FBI's withholdings of File Numbers and Federal Grand Jury Information.

6.      The FBI will therefore provide Plaintiff with justifications for the withholdings of information in full or in part of the agreed upon sample and the additional context pages pursuant to FOIA Exemptions (b)(1), (b)(3), (b)(5), (b)(6), (b)(7)(C), (b)(7)(D), and (b)(7)(E). Specifically, of the 2,537 total pages (from the sample and the context pages), 65 pages were released in full (RIF), 902 pages were released in part (RIP), and 1,570 pages were withheld in full (WIF) based on FOIA exemptions. The FBI will also describe these pages in a *Vaughn* index, and discuss the FBI's cross-reference policy utilized in this case. Further, within this sample, the FBI consulted with Other Government Agencies (OGAs) – Department of the Army

(Army), United States Customs and Border Protection (CBP), Central Intelligence Agency (CIA), Department of Defense (DOD)[1], Department of Justice Criminal Division (DOJ-CRM), Department of State (DOS), United States Immigrations and Customs Enforcement (ICE), Department of the Navy (Navy), and the United States Department of the Treasury (Treasury) - throughout the processing of this case. *See ¶¶ 123-132, infra.*

### LITIGATION PRODUCTIONS FOR COUNT 6
### FOIPA Request Number 1191830 – Gwenyth Todd

7.      The administrative history related to the initial handling of Plaintiff's FOIPA request, up to its production of the first 100 free pages to Plaintiff, has been previously discussed in the Fourth Hardy Declaration (Dkt. No. 29-1, ¶¶ 14-18.) In addition, further administrative history detailing the remainder of the FBI's productions is discussed in detail in the Ninth Hardy Declaration in this case (Dkt. No. 109-1, ¶¶ 7-28.)

*Cross-Reference Processing*

8.      Plaintiff has questioned the FBI's cross-reference processing. When conducting searches for potentially responsive records in this case,[2] the FBI located main files and instances where Ms. Todd was merely a reference in a main file about a different subject matter (*i.e.*, cross-reference). A search using an individual's name will locate any file in which that person's name is indexed, even if the file pertains to another subject. If a cross-reference serial is located

---

[1] The Department of Defense was renamed as the Department of War on September 5, 2025. As such, documents identifying DOD equities in this case now fall under the Department of War.
[2] The FBI described its search methodology for this part of Plaintiff's FOIA request in greater detail in the Fourth Hardy Decl. (Dkt. No. 29-1, ¶¶ 38-40).

through an index search, the particular serials within that main file pertaining to a different

subject matter are reviewed for responsiveness and processed accordingly.[3]

*Bates Stamp Explanation*

9.    Plaintiff expressed confusion pertaining to how the FBI Bates-stamped its

supplemental release containing contextual cross-reference pages. For those records containing

inconsecutive or alpha-designated Bates page numbers, the FBI determined since all the

responsive material in this case had already been processed at that point in this case and these

additional contextual cross-reference pages would consist of pages that were previously

administratively deemed non-responsive, the FBI added letters following the already established

Bates Stamps for those pages already part of previous productions in this case. For example, if

STEIN-3587 was considered a responsive page and addressed during the regular production of

records in the case, however, in re-examining its application of the cross-reference process the

FBI determined that three additional contextual pages were appropriate, it would assign an alpha

designator (*i.e.,* letters) to these as Bates Stamped STEIN-3587-a, STEIN-3587-b, and STEIN-

3587-c respectively. Similarly, if the FBI had previously determined that Bates page STEIN-

4563 was responsive and subsequently determined that 11 additional contextual pages were

necessary, then it would assign those pages as STEIN-4563-a through STEIN-4563-k.   Again,

this is an effort to demonstrate which contextual pages apply to which originally processed

document.

---

[3] The FBI has described its responsiveness determinations in greater detail in the Ninth Hardy
Decl. (Dkt. No. 109-1, ¶¶ 29-34).

JUSTIFICATION FOR NONDISCLOSURE UNDER THE FOIA

10.     The FBI processed all records responsive to Plaintiff's request and contained in

the sample to achieve maximum disclosure consistent with the access provisions of the FOIA.

Every effort was made to provide Plaintiff with all material in the public domain and with all

reasonably segregable, non-exempt information. The FBI did not withhold any reasonably

segregable, nonexempt portions from Plaintiff. Further description of the information withheld,

beyond what is provided in this declaration and/or the attached *Vaughn* Index, could reveal the

actual exempt information or would employ finite resources only to produce disjointed words,

phrases, or sentences, that would have minimal or no informational content. The agreed upon

sample pages contain Bates stamps at the bottom of each page. Pages withheld in their entirety

(*e.g.*, removed per FOIA exemption, consultation with OGAs, or duplicative of other processed

pages) were replaced by a "Deleted Page Information Sheet" (DPIS), which identifies the reason

and/or the applicable FOIA exemptions relied upon to withhold the page in full. RIDS provided

the Bates-numbered pages of the sample released in part to Plaintiff by letters dated October 31,

2019 and December 3, 2019 (*See* Dkt. No. 109-1 ¶¶ 27-28) and these pages may be made

available to the Court upon request. Accordingly, the FBI asserted FOIA Exemptions (b)(1),

(b)(3), (b)(5), (b)(6), (b)(7)(C), (b)(7)(D), and (b)(7)(E) as grounds for non-disclosure of portions

of the sample from the responsive documents here.

*Explanation of the Coded Format Used to Describe and Justify Withholdings*

11.     The Bates-numbered sample pages contain, on their faces, coded categories of

exemptions that detail the nature of the information withheld pursuant to the provisions of the

FOIA. The coded categories are provided to aid the Court's and Plaintiff's review of the FBI's

6

explanations of the FOIA exemptions which the FBI asserted to withhold the material. The coded, Bates-numbered pages together with this declaration and *Vaughn* Index (*See* Ex. A.) demonstrate that all material withheld by the FBI is exempt from disclosure pursuant to the cited FOIA exemptions, or is so intertwined with protected material that segregation is not possible without revealing the underlying protected material.

12.    Each instance of information withheld on the Bates-numbered sample pages is accompanied by a coded designation that corresponds to the categories listed below. For example, if "(b)(7)(C)-1" appears on a document, the "(b)(7)(C)" designation refers to FOIA Exemption 7(C) protecting against unwarranted invasions of personal privacy. The numerical designation of "1" following the "(b)(7)(C)" narrows the main category into a more specific subcategory, such as "Names and/or Identifying Information of FBI Special Agents and Professional Staff."

13.    Listed below are the categories used to explain the FOIA exemptions asserted to withhold the protected material.

| SUMMARY OF JUSTIFICATION CATEGORIES | |
|---|---|
| **CODED CATEGORIES** | **INFORMATION WITHHELD** |
| **Category (b)(1)** | **INFORMATION CLASSIFIED PER EXECUTIVE ORDER 13, 526** |
| (b)(1)-1 | Information Properly Classified By an FBI Official Pursuant to E.O. 13526 |

7

| SUMMARY OF JUSTIFICATION CATEGORIES | |
|---|---|
| **CODED CATEGORIES** | **INFORMATION WITHHELD** |
| **Category (b)(3)[4]** | **INFORMATION PROTECTED BY STATUTE** |
| (b)(3)-1 | National Security Act of 1947, 50 U.S.C. § 3024(h)(1)[5] |
| **Category (b)(5)** | **PRIVILEGED INFORMATION** |
| (b)(5) – 1 | Deliberative Process Privilege |
| (b)(5) – 2 | Attorney Work Product Privilege |
| **Categories (b)(6) and (b)(7)(C)** | **CLEARLY UNWARRANTED INVASION OF PRIVACY AND UNWARRANTED INVASION OF PERSONAL PRIVACY** |
| (b)(6)-1 and (b)(7)(C)-1 | Names and Identifying Information of FBI Special Agents and Professional Staff |
| (b)(6)-2 and (b)(7)(C)-2 | Names and Identifying Information of Commercial Institution Personnel |
| (b)(6)-3 and (b)(7)(C)-3 | Names and Identifying Information of Non-FBI Federal Government Personnel |
| (b)(6)-4 and (b)(7)(C)-4 | Names and Identifying Information of Third Party Individuals Merely Mentioned |
| (b)(6)-5 and (b)(7)(C)-5 | Names and Identifying Information of Local Law Enforcement Personnel |
| (b)(6)-6 and (b)(7)(C)-6 | Names and Identifying Information of Third Party Individuals of Investigative Interest |
| (b)(6)-7 and (b)(7)(C)-7 | Names and Identifying Information of Third Party Individuals who Provided Information |
| **Category (b)(7)(D)[6,7]** | **CONFIDENTIAL SOURCE INFORMATION** |

---

[4] Consistent with Plaintiff's agreement to concede Federal Grand Jury information (*see* ¶ 5, *supra*), the FBI will not address Categories (b)(3)-2 for Federal Grand Jury Information.

[5] Section 102A(i)(1) of the National Security Act was previously codified at 50 U.S.C. § 403(i)(1). As a result of the reorganization of Title 50 of the U.S. Code, § 102A(i)(1) was later codified at 50 U.S.C. § 3024(i)(1) and was more recently codified at 50 U.S.C. § 3024(h)(1).

[6] The FBI cited Category (b)(7)(D)-4, however, upon further review the FBI has determined this information should be protected with Category (b)(7)(D)-1.

[7] Consistent with Plaintiff's agreement to concede File Numbers (*see* ¶ 5, *supra*), the FBI will

| SUMMARY OF JUSTIFICATION CATEGORIES | |
| --- | --- |
| **CODED CATEGORIES** | **INFORMATION WITHHELD** |
| (b)(7)(D)-1 | Names, Identifying Data and/or Information Provided by Individuals Under an Express Assurance of Confidentiality |
| (b)(7)(D)-3 | Confidential Source Symbol Numbers |
| (b)(7)(D)-5 | Names, Identifying Data and/or Information Provided by Individuals Under an Implied Assurance of Confidentiality |
| **Category (b)(7)(E)[8,9]** | **LAW ENFORCEMENT INVESTIGATIVE TECHNIQUES AND PROCEDURES** |
| (b)(7)(E)-2 | Collection and Analysis of Information |
| (b)(7)(E)-3 | Sensitive Non-Public Investigation Code Names |
| (b)(7)(E)-4 | Classified Law Enforcement Techniques Utilized to Conduct National Security Investigations |
| (b)(7)(E)-5 | Identity and/or Location of FBI or Joint Units, and Squads |
| (b)(7)(E)-6 | Dates and Types of Investigations (Preliminary / Full Investigations) |
| (b)(7)(E)-7 | Investigative Focus of Specific Investigations |
| (b)(7)(E)-8 | Database Information, Results, and/or Printouts |
| (b)(7)(E)-11 | Information Related to Polygraphs |
| (b)(7)(E)-12 | Monetary Payments for Investigative Techniques |
| (b)(7)(E)-13 | Information Regarding Targets and Scope of Surveillance |
| (b)(7)(E)-14 | Internal FBI Secure Fax Number/Telephone Number, Email or IP Address, Intranet/Web Address/URL |
| (b)(7)(E)-15 | Computer Analysis Response Team (CART) Reports and/or Data |
| (b)(7)(E)-16 | Operational Directives |
| (b)(7)(E)-17 | Tactical Information Contained in Operational Plans |

FOIA EXEMPTION 1 – CLASSIFIED INFORMATION[10]

---

not address Categories (b)(7)(D)-2 for Confidential Source File Numbers or (b)(7)(E)-1 for Sensitive File Numbers and Sub files in this declaration.

[8] The FBI cited Category (b)(7)(E)-9, however, upon further review the FBI has determined this information should be protected with Category (b)(7)(E)-14.

[9] The FBI cited Category (b)(7)(E)-10, however, upon further review the FBI has determined this information should be protected with Category (b)(7)(E)-2.

[10] Upon determining that the FBI would need to review its withholdings since the filing of the agency's previous Motion for Summary Judgment (MSJ) in this case, the FBI conducted a new review of all materials previously withheld pursuant to Exemption 1 and determined that all

14.     The FBI's analysis for withholding classified information contained in the records at issue is based on the standards articulated in the FOIA statute, 5 U.S.C. § 552(b)(1). Exemption 1 protects from disclosure those records that are:

    a.  specifically authorized under criteria established by an Executive Order to be kept secret in the interest of national defense or foreign policy; and

    b.  are in fact properly classified pursuant to such Executive Order.

15.     Before I consider an Exemption 1 claim for withholding agency records, I determine whether the information in those records satisfies the requirements of Executive Order (E.O.) 13526, the executive order governing the classification and protection of information that affects the national security, and whether the information complies with the various substantive and procedural criteria of that order. Executive Order 13526, signed by President Barack Obama on December 29, 2009, is the order that currently applies to the protection of national security information. I am bound by the requirements of E.O. 13526 when making classification determinations.

16.     For information to be properly classified, and thus properly withheld from disclosure pursuant to Exemption 1, the information must meet the requirements set forth in E.O. 13526 § 1.1(a):

    a.  an original classification authority is classifying the information;

    b.  the information is owned by, produced by or for, or is under the control of the United States Government;

---

previously asserted withholdings remain unchanged.

    c.   the information falls within one or more of the categories of information listed in § 1.4 of [the] order; and

    d.   the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security, which includes defense against transnational terrorism, and the original classification authority is able to identify or describe the damage.

17.    As I will explain in further detail below, in my role as an original classification authority, I have determined that the information withheld pursuant to Exemption 1 is under the control of the United States Government, is classified, and requires a classification marking at the "Secret," level since the unauthorized disclosure of this information reasonably could be expected to cause serious damage to national security. *See* E.O. 13526 § 1.2(a)(2). In addition to these substantive requirements, certain procedural and administrative requirements of E.O. 13526 must be followed before information can be considered properly classified, such as, proper identification and marking of documents. In particular, I made certain that all procedural requirements of E.O. 13526 were followed:

    a.   each document was marked as required and stamped with the proper classification designation;

    b.   each document was marked to indicate clearly which portions are classified, which portions are exempt from declassification as set forth in E.O 13526 § 1.5(b);

    c.   the prohibitions and limitations on classification specified in E.O. 13526 § 1.7 were adhered to;

d.  the declassification policies set forth in E.O. 13526 §§ 3.1 and 3.3 were followed; and

e.  any reasonably segregable portions of the classified documents that did not meet the standards for classification under E.O. 13526 were declassified and marked for release, unless withholding was otherwise warranted under applicable law.

**Findings of the Declarant Regarding Exemption 1**

18.     With the above requirements in mind, I personally and independently examined the FBI information withheld pursuant to FOIA Exemption 1. I determined all of the substantive, procedural, and administrative requirements set forth above have been satisfied. As a result, I concluded that the information protected pursuant to Exemption 1 was properly classified, continues to warrant classification at the "Secret" level, and is exempt from disclosure pursuant to E.O. 13526 § 1.4(c) – "intelligence activities (including covert action), intelligence sources or methods, or cryptology."

*E.O. 13526 § 1.4(c) – Intelligence Activities, Sources and Methods*

19.     E.O. 13526 § 1.4(c), exempts intelligence activities (including covert action), intelligence sources and methods, and cryptology from disclosure. An intelligence activity or method includes any intelligence action or technique utilized by the FBI against a targeted individual or organization that has been determined to be of national security interest. An intelligence method is used to indicate any procedure (human or non-human) utilized to obtain information concerning such individual or organization. An intelligence activity or method has two characteristics. First, the intelligence activity or method -- and information generated by it -- is needed by U. S. intelligence/counterintelligence agencies to carry out their respective

12

missions. Second, confidentiality must be maintained with respect to the activity or method if the viability, productivity, and usefulness are to be preserved.

20.     In the records at issue, the FBI withheld information pursuant to Exemption 1 to protect intelligence activities and methods utilized by the FBI to gather intelligence. This information is classified because its release would reveal actual intelligence activities and methods used by the FBI against specific targets of foreign counterintelligence investigations or operations; identify a target of a foreign counterintelligence investigation; and/or disclose the intelligence gathering capabilities of the activities and methods directed at specific targets. The information obtained from intelligence activities and methods within the records at issue is very specific in nature, provided during a specific time period, and known to very few individuals.

21.     It is my determination that disclosure of specific information describing the intelligence activities and methods within the records at issue, which are still used by the FBI to gather intelligence information in other investigations, could reasonably be expected to cause serious damage to the national security for the following reasons:

    a.  disclosure would allow hostile entities to discover the current intelligence gathering activities and methods used by the FBI;

    b.  disclosure would reveal current targets of specific FBI national security investigations; and

    c.  disclosure would reveal the criteria used and priorities assigned to current intelligence or counterintelligence investigations.

With the aid of this detailed information, hostile entities could develop countermeasures which would, in turn, severely disrupt the FBI's intelligence gathering capabilities. This severe

13

disruption would also result in severe damage to the FBI's efforts to detect and apprehend those who violate national security and criminal laws of the United States. The FBI protected the following categories of information specific to intelligence activities and methods because disclosure reasonably could be expected to cause serious damage to the national security of the United States.

*Detailed Intelligence Activities*

22.    The FBI withheld classified information concerning detailed intelligence activity information gathered or compiled by the FBI on a specific individual or organization of national security interest. The disclosure of this information could reasonably be expected to cause serious damage to the national security as it would: (a) reveal the actual intelligence activity or method utilized by the FBI against a specific target; (b) disclose the intelligence-gathering capabilities of the activity; and (c) provide an assessment of the intelligence source penetration of a specific target during a specific period of time. This information is properly classified at the "Secret" level pursuant to E.O. 13526 § 1.4(c) and is exempt from disclosure pursuant to FOIA Exemption 1.

23.    *File Numbers.* The FBI withheld classified file numbers assigned to specific intelligence activities, including channelization and dissemination instructions. Their release would lead to exposure of particular intelligence activities and methods. Individual file numbers are assigned by FBIHQ and field offices and contain a geographical prefix of the originating office and case number, which includes the numerical characterization of the type of investigation, followed by a chronological number assigned to a specific investigation or activity.

24.    The disclosure of an intelligence file number in the aggregate will enable adversaries to attribute any information released from the records, the file number to that particular file. Through analysis of this information, in concert with other information, including publically available information, adversaries could then identify the specific intelligence activity. Hence, a partial mosaic of the activity begins to appear as more information is identified as being associated with the particular file number, leading to the exposure of current activities. In other words, disclosure of the file number would allow the adversaries of the United States, or anyone not privileged to this information, to patch bits and pieces of information together until the activity is determined. The identification of the intelligence activity, which continues to be a source of intelligence to this day, will severely limit its use. In addition, disclosure will inform adversaries of the possible range of the FBI's intelligence capabilities, as well as the intelligence the FBI has gathered, or can collect, concerning them. This knowledge would provide violators of the national security laws of the United States with a means of avoiding of lawful regulations by potentially implementing countermeasures, making future operations more difficult and compromising intelligence operations. Accordingly, release of these file numbers can lead to the exposure of an intelligence activity utilized by the FBI, and can reasonably be expected to cause serious damage to national security. These file numbers are properly classified at the "Secret" level pursuant to E.O. 13526 § 1.4(c) and are exempt from disclosure pursuant to FOIA Exemption 1.

25.    *Character and Title of Case.* The FBI withheld classified information concerning the character and/or title of the case for specific types of intelligence activities directed at specific targets of national security interest. Disclosure of the characterization and/or title of this

case could reasonably be expected to cause serious damage to the national security of the United States, as it would (a) disclose a particular intelligence or counterintelligence investigation; (b) disclose the nature, scope or thrust of this investigation; and (c) reveal the manner by which intelligence or counterintelligence information was acquired. This information is properly classified at the "Secret" level and withheld pursuant to E.O. 13526 § 1.4(c) and is exempt from disclosure pursuant to FOIA Exemption 1, in conjunction with Exemption 3 for the National Security Act of 1947, and Exemption 7(E).

26.     _Classified Human Intelligence Sources and Information Provided._ A classified human intelligence source is an individual who provided or is currently providing information pertaining to national security matters, and disclosure of this individual's identity and or the information they provided could reasonably be expected to result in serious damage to the FBI's intelligence and counterintelligence-gathering capabilities.

27.     Through my review I determined the information contained in these documents, which pertains to classified human intelligence sources, is specific and, if disclosed, could reasonably be expected to reveal the identities of the contributing sources. I consider a number of factors when considering if such information should be/remain classified, including most importantly, the damage to the national security from publicly identifying sources utilized in intelligence investigations, and the FBI's ability to protect and recruit such intelligence sources in the future.

28.     Disclosure of the identities of FBI intelligence sources, regardless of whether they are active or inactive, alive or deceased, can reasonably be expected to cause current and potential intelligence sources to fear their identities will be publicly revealed at some point,

16

despite the FBI's express or implied assurances of confidentiality. The disclosure of sources'

identities could jeopardize the emotional and physical well-being of the source or the sources'

family or associates, and/or subject them to public ridicule and ostracism.

29.     Thus, the release of information I determined to be source-identifying could

reasonably be expected to cause serious damage to the national security by causing current

intelligence sources to cease providing information, and discourage potential intelligence sources

from cooperating with the FBI for fear their identities would be publicly revealed at some point.

Such a reticence among current/potential sources would endanger one of the most crucial means

of collecting intelligence information and, therefore, severely hamper the FBI's efforts to detect

and apprehend individuals who seek to damage the national security through violation of the

United States criminal and national security laws. Therefore, such identifying information and

information provided by human intelligence is properly classified at the "Secret" level pursuant

to E.O. 13526, § 1.4(c), and is exempt from disclosure pursuant to Exemption 1.

30.     The following categories of intelligence source information were withheld: (1)

detailed human intelligence source information; (2) human intelligence source symbol numbers;

(3) human intelligence source code names; and (4) human intelligence source file numbers.

Below is a more detailed discussion of each of these categories.

      a.     *Detailed Human Intelligence Source Information.* The FBI withheld classified

information provided by human intelligence sources. This information is specific

in nature and reflects the specific vantage point of the sources. If disclosed, this

information could identify the intelligence sources and potentially subject them to

retaliation based on their cooperation with the FBI. Furthermore, it could dissuade

current and future FBI human intelligence sources from continuing to cooperate with the FBI.

b. *Human Intelligence Source Symbol Numbers, Code Names, and File Numbers.* The FBI withheld classified information consisting of singular identifying numbers or code names for intelligence sources. Numerical designators such as source symbol numbers and file numbers and code names serve as singular identifiers for intelligence sources who provide information concerning individuals or organizations determined to be of national security interest. A singular identifier is used in lieu of the true identity of a source. These identifiers are assigned to specific sources and are unique to, and solely used for, specific sources. The numerical designators (file numbers and source symbol numbers) are assigned sequentially. The disclosure of this information could permit a hostile analyst to correlate the documents and whatever information that can be gleaned from the documents to specific sources. By matching source identifiers, such as file numbers, source symbol numbers, and code names, with bits and pieces of other information, one can begin to discern the true identity of the intelligence sources. Public identification of a source will limit the effectiveness of these sources, could subject sources to retaliation by those on whom they provided information, and could also have a significant chilling effect on the FBI's ability to recruit future sources. Release of this information could reasonably be expected to cause serious damage to national security and is therefore properly classified at

18

the "Secret" level pursuant to E.O. 13526, § 1.4(c), and is exempt from disclosure pursuant to Exemption 1.

**Defendant's Burden of Establishing Exemption 1 Claims**

31.     The information withheld in this case pursuant to Exemption 1 was examined in light of the body of information available to me concerning the national defense and foreign relations of the United States. This information was not examined in isolation. Instead, each piece of information was evaluated with careful consideration given to the impact that disclosure of this information will have on other sensitive information contained elsewhere in the United States intelligence community's files. Equal consideration was given to the impact that other information either in the public domain or likely known or suspected by present or potential adversaries of the United States would have upon the information I examined.

32.     In those instances where, in my judgment, the disclosure of this information could reasonably be expected to cause damage or serious damage to the national security, and its withholding outweighed the benefit of disclosure, I exercised my prerogative as an original classification authority and designated that information as classified in the interest of national security at the "Secret" level, and invoked FOIA Exemption 1 to prevent disclosure. The explanations set forth below justifying the FBI's withholding of classified information were prepared with the intent that they be read with consideration given to the context in which the classified information is found. This context includes not only the surrounding unclassified information, but also other information already in the public domain, as well as information likely known or suspected by hostile intelligence entities. Additionally, responsive material sent to the CIA for consultation contains similarly classified information related to intelligence

19

activities, sources, and methods closely intertwined with the FBI's redactions here and its underlying investigations. As such, the CIA requested that the FBI apply Exemptions 1 and 3 on these pages and to relay, within the FBI's declaration, its assertion of these exemptions to justify their withholdings in the sample at issue in this case. It is my judgment that any greater specificity in the descriptions and justifications set forth with respect to information relating to intelligence sources and methods of the United States could reasonably be expected to jeopardize the national security of the United States.

FOIA EXEMPTION 3 – INFORMATION PROTECTED BY STATUTE

33.    FOIA Exemption 3 exempts from disclosure information "specifically exempted from disclosure by statute . . . if that statute (A)(i) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue; or (A)(ii) establishes particular criteria from withholding or refers to particular types of matters to be withheld." 5 U.S.C. § 552 (b)(3). The OPEN FOIA Act of 2009 established an additional requirement that any statute "enacted after the date of enactment of the OPEN FOIA Act of 2009, [must] specifically cite[] to this paragraph" in order to qualify under Exemption 3.

*(b)(3)-1: National Security Act of 1947, 50 U.S.C. § 3024 (h)(1)*[11]

34.    The FBI asserted Exemption (b)(3)-1 to withhold information pursuant to Section 102A(i)(1) of the National Security Act of 1947 (NSA), as amended by the Intelligence Reform and Terrorism Prevention Act of 2004 (IRTPA). This statute provides that the Director of National Intelligence (DNI) "shall protect, and shall establish and enforce policies to protect,

---

[11] *See supra* fn.5.

20

intelligence sources and methods from unauthorized disclosure." As relevant to 5 U.S.C.

§ 552(b)(3)(B), the National Security Act of 1947 was enacted before the date of enactment of

the OPEN FOIA Act of 2009. On its face, this federal statute leaves no discretion to agencies

about withholding from the public information about intelligence sources and methods. Thus, the

protection afforded to intelligence sources and methods by 50 U.S.C. § 3024(h)(1) is absolute.

*See CIA v. Sims*, 471 U.S. 159 (1985).

35.     To fulfill its obligation of protecting intelligence sources and methods, the DNI is

authorized to establish and implement guidelines for the Intelligence Community (IC) for the

classification of information under applicable laws, Executive Orders, and other Presidential

Directives, and for access to and dissemination of intelligence. 50 U.S.C. § 3024(h)(1). In

implementing this authority, the DNI promulgated Intelligence Community Directive 700, which

provides that IC elements shall protect "national intelligence and intelligence sources and

methods and activities from unauthorized disclosure."[12]  The FBI is one of 18 member agencies

comprising the IC, and as such must protect intelligence sources and methods. 50 U.S.C.

§ 3003(4).

36.     Given the plain Congressional mandate to protect the IC's sources and methods of

gathering intelligence, the FBI has determined that intelligence sources and methods would be

revealed if any of the withheld information is disclosed to Plaintiff. Therefore, the FBI is

prohibited from disclosing such information under § 3024 (h)(1).[13]

---

[12] Intelligence Community Directive (ICD) 700, dated June 7, 2012, at ¶ E.2.a.
[13] Although § 3024 (h)(1) does not impose a requirement to articulate harm, disclosure of this information presents a bona fide opportunity for individuals to develop and implement countermeasures, resulting in the loss of significant intelligence information, sources, and

37.    The FBI is asserting Exemption 3, in conjunction with the National Security Act of 1947, 50 U.S.C. § 3024 (h)(1), to protect information related to the National Foreign Intelligence Program (NFIP). The NFIP is now known as the National Intelligence Program (NIP). The NIP consists of all programs, projects, and activities of the Intelligence Community, as well as any other programs of the Intelligence Community designated jointly by the Director and the head of a United States department or agency or by the President. The activities of the Intelligence Community include the strategic use of various sources to obtain intelligence related information and are through a myriad of available methods of intelligence gathering, not all of which are known to the public. As a federal agency within the Intelligence Community and a federal law enforcement agency, some of the FBI's programs and/or activities relate to the NIP. In this case, the FBI protected information which shows the FBI's role in the NIP pursuant to Exemption 3.

38.    The FBI is asserting Exemption 3 in this case, at times in conjunction with Exemptions 1 and 7(E) to protect information that would reveal intelligence sources and methods. In some instances, information would reveal classified intelligence sources and methods protected by Exemption 1. In some instances, information was protected under Exemption 7(E) because unclassified intelligence sources and methods were employed as law enforcement techniques, procedures or guidelines and thus would qualify as both an intelligence source and method under Exemption 3 and a law enforcement technique under Exemption 7(E). Notably, § 3024 (h)(1) protects sources and methods regardless of whether they are classified.

---

methods relied upon by national policymakers and the IC to safeguard national security.

*See Sims*, 471 U.S. at 176. Similarly, as discussed at ¶ 34 *supra,* the CIA advised its assertion of Exemption 3 in the sample in this case was also for the National Security Act of 1947. Thus, because its assertion of Exemption 3 is closely intertwined with the FBI's redactions here and its underlying investigations, CIA requested the FBI to also relay, within the FBI's declaration, its assertion of these Exemptions 1 and 3 to justify their withholdings in the sample at issue in this case.

FOIA EXEMPTION 5 – PRIVILEGED INFORMATION

39.     Exemption 5 of the FOIA exempts from mandatory disclosure "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than "an agency in litigation with the agency." 5 U.S.C. § 552(b)(5).

40.     Exemption 5 has been construed to exempt documents or information normally privileged in the civil discovery context, and incorporates the attorney work product, attorney-client, and deliberative process privileges. The deliberative process privilege protects pre-decisional, deliberative communications that are part of a process by which agency decisions are made. It protects opinions, advice, evaluations, deliberations, proposals, or recommendations that form part of an agency decision-making process, as well as the selection and sorting of factual information relied upon as part of the decision-making process.

41.     In order to apply Exemption 5, agencies must first satisfy the threshold requirement – *i.e.*, show that the information protected was "inter-agency" or "intra-agency." As it pertains to the documents of the sample withheld pursuant to Exemption 5 in this case, the documents themselves have been withheld in their entirety pursuant to other FOIA Exemptions – chiefly Exemption 1 – and although no material has been released to Plaintiff, in its review the

FBI determined the inter-agency and/or intra-agency character of the documents is readily apparent on their face or by the context in which they appear. The documents were generated and distributed in the context of internal FBI discussions or communications between the FBI and other federal agencies, as will be further demonstrated in the following paragraphs. Once the threshold is satisfied, agencies must satisfy the elements of the pertinent privilege. With respect to the deliberative process privilege, agencies must show that the withheld information was both pre-decisional – *i.e.*, antecedent to a final agency decision – and deliberative – *i.e.*, part of the process in which the agency engaged in an effort to reach a final decision (whether or not any final decision was ever reached). The satisfaction of the particular elements is discussed in further detail in the following paragraphs.

*(b)(5)-1: Deliberative Process Privilege*

42.     In Exemption category (b)(5)-1, the FBI protected privileged deliberative materials within the sample of processed pages in this case. The deliberative process privilege protects the internal deliberations of the government by insulating recommendations, analyses, opinions, and other non-factual information comprising the decision-making process. In turn, Exemption 5 allows for the withholding of such privileged material – i.e., material that contains, or was prepared in connection with the formulation of, opinions, advice, evaluations, deliberations, policies, proposals, conclusions, or recommendations. The privilege also protects records and information that if disclosed, would reveal the agency's collection of multitudinous facts, and the sorting, evaluation, and analysis of those facts in order to make recommendations or reach a final agency decision. Exemption 5, when asserted in conjunction with the deliberative process privilege, is predicated on the recognition that release of this privileged information

24

would inhibit the government's development of policy and stifle its decision-making process. Furthermore, exempting such documents from disclosure also protects against public confusion that might result from preliminary disclosure of opinions and information that do not, in fact, reflect the final views or policies of the FBI. The exemption and privilege together protect not only documents but also the integrity of the deliberative process itself where exposure of the process would result in harm. The FBI invokes Exemption 5 and the deliberative process privilege because FBI employees would hesitate to offer their candid and conscientious opinions to superiors or coworkers if they knew that their opinions of the moment might be made a matter of public record at some future date, and because such self-censorship would, in turn, degrade the quality of agency decisions by depriving the decision-makers of fully explored options developed from robust debate.

43.     Here, the FBI applied this exemption to draft documents also withheld in full pursuant to other FOIA Exemptions, chiefly Exemption 1, as the information is also classified in its entirety. Draft documents are inherently part of the deliberative process. They predate final agency decisions and reflect the give and take of deliberations, through the editing process, which leads to a final, refined product. In the instances where the FBI withheld draft material pursuant to Exemption (b)(5), the FBI found the drafts were pre-decisional (predated the final product) due to the language used on the documents and the word "DRAFT" stamped on them. Release of these drafts is reasonably anticipated to harm agency deliberations and cooperation with other entities including foreign partners. The drafts were similarly part of a deliberative process given the type of language used in documents surrounding the material. For example, for an email Bates numbered as STEIN-1170, the FBI released in part phrases such as "Attached

25

please find the [REDACTED]"; "I used the same language as the [REDACTED]"; "… and added a paragraph stating the information provided [REDACTED]." The FBI did not cite Exemption 5 and the deliberative process privilege to information within this email, however, it cited Exemption 5 and the deliberative process privilege to the draft attachment located at STEIN-1171 through 1188. The harm in releasing here would be a chilling effect on agency employees' willingness to share such drafts if they knew their unrefined ideas would be subject to public disclosure as well as the potential of less cooperation or frankness from those consulted on drafts. Furthermore, there would be a risk of public confusion in that these drafts do not reflect final agency decisions. Additionally, in compliance with the FOIA Improvement Act of 2016, all of this material was created less than 25 years before the submission of Plaintiff's request. The release of the withheld information on these draft documents is likely to chill full, frank, and open discussions between federal agency personnel involved in the investigations at issue here because, if these personnel were aware that their input provided in the form of these drafts was subject to public scrutiny, they would be less likely to freely exchange the information needed to actively participate in such deliberations.

44.     Similarly, responsive material sent to DOJ-CRM for consultation contains information related to privileged deliberative materials also and DOJ has requested the FBI to apply this exemption on these pages and to relay, within the FBI's declaration, DOJ's assertion of these exemptions to justify their withholdings. The same rationale discussed above applies to DOJ's equities for protecting deliberative materials.

45.     For the reasons discussed above,the FBI properly applied the deliberative process privilege under Exemption 5 to withhold pre-decisional and deliberative material. The FBI

segregated non-deliberative facts, whenever possible, and only withheld such material when it found it was inextricably intertwined with agency deliberations.

*(b)(5)-2: Attorney Work Product Privilege*

46.     In Exemption category (b)(5)-2, the FBI protected privileged attorney work products. The attorney work product privilege protects such tangible and intangible items as interviews, memoranda, correspondence, mental impressions, and personal beliefs prepared or developed by an attorney, or at the direction of an attorney, in reasonable anticipation of litigation. The privilege is predicated on the recognition that proper preparation of a case depends on an attorney's ability to assemble information, sort relevant from irrelevant facts, and prepare his/her legal theories and strategies without intrusive or needless scrutiny.

47.     The FBI relied on the attorney work product privilege to protect information and instructions related to legal defense strategy concerning third party individuals of investigative interest, as well as the actions of the United States Attorney's Office (USAO) regarding these third party individuals. Although the majority of the material is withheld pursuant to other FOIA Exemptions, chiefly Exemption 1, due to the classified nature of the material, the FBI reviewed these instances of this privilege and determined that they pertained to information requested by agency counsel acting in their official capacity. The FBI further determined these instances indicated the clear nexus to anticipation of litigation and discussion at the direction of attorneys from the USAO.

48.     In addition, responsive material sent to DOJ-CRM for consultation also contains information related to privileged attorney work product materials and DOJ has requested the FBI to apply this exemption on these pages and to relay, within the FBI's declaration, DOJ's

assertion of these exemptions to justify their withholdings. The same rationale discussed above applies to DOJ's equities for protecting materials covered under the attorney work product privilege.

49.     As described in ¶¶ 46-48 *supra*, release of this type of information would interfere with government attorneys' ability to properly prepare their legal theories and strategies and hinder them in providing the best possible representation of their clients [the government]. Finally, because the attorney work product privilege protects both factual and deliberative material, segregation is not required. Accordingly, the FBI properly withheld this information pursuant to Exemption 5.

EXEMPTION 7 THRESHOLD

50.     Before an agency can invoke any of the harms enumerated in Exemption (b)(7), it must first demonstrate that the records or information at issue were compiled for law enforcement purposes. Pursuant to 28 USC §§ 533, 534, and Executive Order 12333 as implemented by the Attorney General's Guidelines for Domestic FBI Operations (AGG-DOM) and 28 CFR § 0.85, the FBI is the primary investigative agency of the federal government with authority and responsibility to investigate all violations of federal law not exclusively assigned to another agency, to conduct investigations and activities to protect the United States and its people from terrorism and threats to national security, and further the foreign intelligence objectives of the United States. Under this investigative authority, the responsive records were compiled in the course of the FBI's national security Counterintelligence (CI) investigations with regard to certain individuals.

51.    Considering these records were compiled to document the FBI's investigations of potential crimes and possible threats to national security, the FBI determined they were compiled for law enforcement purposes.

*FOIA Exemptions (b)(6) and (b)(7)(C) – Unwarranted Invasion of Personal Privacy*

52.    Exemption 6 exempts from disclosure "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). All information that applies to a particular person falls within the scope of Exemption 6.

53.    Exemption 7(C) similarly exempts from disclosure "records or information compiled for law enforcement purposes [when disclosure] could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C).[14]

54.    When withholding information pursuant to these two exemptions, the FBI is required to balance the privacy interests of the individuals mentioned in these records against any public interest in disclosure. In asserting these exemptions, each piece of information was scrutinized to determine the nature and strength of the privacy interest of every individual whose name and/or identifying information[15] appears in the documents at issue. When withholding the

---

[14]  The practice of the FBI is to assert Exemption 6 in conjunction with Exemption 7(C). Although the balancing test for Exemption 6 uses a "would constitute a clearly unwarranted invasion of personal privacy" standard and the test for Exemption 7(C) uses the lower standard of "could reasonably be expected to constitute an unwarranted invasion of personal privacy," the analysis and balancing required by both exemptions is sufficiently similar to warrant a consolidated discussion. The privacy interests are balanced against the public's interest in disclosure under both exemptions.

[15]  Hereafter, identifying information includes the following: dates of birth, social security numbers, addresses, telephone numbers, and/or other personal information.

29

information, the individual's privacy interest was balanced against the public's interest in disclosure. For purposes of these exemptions, a public interest exists only when information about an individual, their name, or their identifying information would shed light on the FBI's performance of its mission to protect and defend the United States against terrorist and foreign intelligence threats, to uphold and enforce the criminal laws of the United States, and to provide leadership and criminal justice services to federal, state, municipal, and international agencies and partners. In each instance where information was withheld pursuant to Exemptions 6 and 7(C), the FBI determined that the individuals' privacy interests outweighed any public interest in disclosure.

55.    Furthermore, considering privacy concerns are typically obviated once an individual is deceased,[16] when processing FOIPA requests, the FBI takes several steps to ascertain the current life/death status of the individuals whose names are withheld. The FBI uses the birth date and/or the date of the investigations to determine whether an individual is living or deceased, to the extent either or both of these pieces of information are discernable from the file. The date of birth is used to apply the judicially recognized "100-year rule," i.e., if the individual was born more than 100 years ago, the FBI presumes that he or she is dead and the name is released. The FBI also uses institutional knowledge gained from prior FOIA requests or internal records. By using institutional knowledge, the FBI can identify with sufficient certainty the life/death status of certain individuals. If the FBI is unable to determine the life/death status of an

---

[16] In some circumstances, surviving relatives of a deceased individual retain privacy interests in their information, even after the individual's death. See generally National Archives v. Favish, 124 S. Ct. 1570 (2004).

individual through the use of these methods, the name of the individual is withheld pursuant to Exemptions 6 and 7(C), when it finds disclosure would constitute an unwarranted invasion of those individuals' privacy should they still be living, and no public interest would be served in releasing the names. It is also the FBI's policy to release names of high-ranking FBI officials as well as individuals in public positions, as they have diminished privacy rights while acting in their official capacity. This policy is applied to the individual's position at the time of the document, and not the present.

*(b)(6)-1 and (b)(7)(C)-1: Names and Identifying Information of FBI Special Agents and Professional Staff*

56.      Within Exemption category (b)(6)-1 and (b)(7)-1, the FBI protected the names and identifying information of FBI Special Agents (SAs) and professional staff. These FBI SAs and professional staff were responsible for conducting, supervising, and/or maintaining the investigative activities reflected in the documents responsive to Plaintiff's FOIA request. These responsibilities included, but are not limited to, the following: coordinating/completing tasks in support of the FBI's investigative and administrative functions, compiling information, conducting interviews, and/or reporting on the status of the investigations.

57.      FBI Special Agents. Assignments of SAs to any particular investigation are not by choice. Publicity, adverse or otherwise, arising from a particular investigation and/or use of specific FBI investigative techniques, may seriously prejudice their effectiveness in conducting other investigations or performing their day-to-day work. The privacy consideration is also applied to protect FBI SAs, as individuals, from unnecessary, unofficial questioning as to the conduct of this or other investigations/investigative activities, whether or not they are currently

31

employed by the FBI. FBI SAs conduct official inquiries into various criminal and national security violation cases. The publicity associated with the release of an SA's identity in connection with a particular investigation and/or investigative activities could trigger hostility toward a particular SA. During an investigation, an SA may engage with all strata of society, conducting searches and making arrests, both of which result in reasonable but nonetheless serious disturbances to people and their lives. Individuals targeted by such investigations and investigative activities, and/or those sympathetic to those targeted, could seek to inflict violence on an SA based on their participation in an investigation or in the deployment of certain investigative techniques. This is because an individual targeted by such law enforcement actions may carry a grudge against those involved with the investigation, which may last for years. These individuals may seek revenge on SAs and other federal employees involved in a particular investigation or investigative activities. There is no public interest served by disclosing the SAs' identities because their identities would not, themselves, significantly increase the public's understanding of the FBI's operations and activities. Thus, disclosure of this information would constitute a clearly unwarranted invasion of their personal privacy; and the FBI properly withheld the names and identifying information of FBI SAs pursuant to Exemptions 6 and 7(C).

58.    FBI Professional Staff. The FBI also withheld the names and identifying information of FBI professional staff pursuant to Exemptions 6 and 7(C). These FBI professional staff were assigned to handle tasks related to the investigations at issue. Similar to FBI SAs, these FBI employees could be targeted for reprisal based on their involvement in specific investigations/investigative activities. Furthermore, these FBI professional staff were, and possibly are, in positions of access to information regarding official law enforcement

32

investigations, and therefore could become targets of harassing inquiries for unauthorized access to investigations if their identities were released. Thus, these individuals maintain substantial privacy interests in not having their identities disclosed. In contrast, the FBI concluded that no public interest would be served by disclosing the identities of these FBI professional staff to the general public because their identities would not, themselves, significantly increase the public's understanding of the FBI's operations and activities. Accordingly, after balancing these professional staff employees' substantial privacy interests against the non-existent public interest, the FBI determined disclosure of their identities would constitute a clearly unwarranted invasion of their personal privacy. Therefore, the FBI properly withheld the names and identifying information of FBI professional staff pursuant to Exemptions 6 and 7(C).

59.     <u>FBI Employee Unique Employer Identification Number.</u> The FBI withheld the Unique Employee Identification Numbers (UEID) of FBI Professional Staff members involved in the classification review of the records, pursuant to FOIA Exemptions (b)(6) and (b)(7)(C). UEIDs are singular numbers assigned to employees and serve as a means of identification within the government. These unique identifiers could be used to identify the employees who reviewed these documents. This, in turn, could subject the employees to targeted attempts to obtain sensitive and/or classified FBI information to which they may have access due to their FBI employment.

60.     Furthermore, adversaries could co-opt the information to impersonate the employees' identities in relation to agency business. As such, the FBI determined these employees maintain substantial privacy interests in not having the UEIDs disclosed. In contrast, there is no public interest in this singular piece of information because its disclosure would not

33

significantly increase the public's understanding of FBI operations and activities. Accordingly, on balance, these employees' privacy interests prevail and thus, the FBI properly withheld the UEIDs pursuant to FOIA Exemptions (b)(6) and (b)(7)(C).

*(b)(6)-2 and (b)(7)(C)-2: Names and Identifying Information of Commercial Institution Personnel*

61.     In Exemption category (b)(6)-2 and (b)(7)(C)-2, the FBI withheld the names and identifying information of private, commercial employees who provided assistance to the FBI and other law enforcement agencies during the course of the investigations. These individuals assisted the FBI in their official capacities and were able to do so due to their employment. Identifying them in this context (within law enforcement records) could subject them to unofficial inquiries for information related to their assistance, not anticipated by their contact with the FBI. Additionally, they could be targeted for retaliation by investigative subjects, those hostile to the FBI, or those who disparage cooperation with law enforcement, as a result of their cooperation. Thus, these individuals maintain substantial privacy interests in not being disclosed in this context. In contrast, there is no public interest to be served by publicly disclosing their identities as doing so would not increase public understanding of FBI operations and activities. Accordingly, the FBI protected these individuals' names and identifying information pursuant to Exemptions 6 and 7(C).

*(b)(6)-3 and (b)(7)(C)-3: Names and Identifying Information of Non-FBI Federal Government Personnel*

62.     In Category (b)(6)-3 and (b)(7)(C)-3, the FBI protected the names and identifying information of personnel from non-FBI federal government agencies who provided information to or otherwise assisted the FBI in its investigations. Specifically, the material contains the

names of Department of the Navy (Navy) personnel. The rationale for protecting the identities of other government employees is the same as the rationale for protecting the identities of FBI employees. See ¶¶ 57-58, *supra*. Publicity, adverse or otherwise, concerning the assistance of these other agency employees in FBI investigations would seriously impair their effectiveness in assisting or participating in future FBI investigations. The privacy consideration also protects these individuals from unnecessary, unofficial questioning as to the FBI investigations. It is possible for a person targeted by law enforcement action to carry a grudge which may last for years, and to seek revenge on the personnel involved in the investigations at issue in these FBI records. The publicity associated with the release of their names and/or identifying information in connection with these investigations could trigger hostility towards them by such persons. Therefore, these employees maintain substantial privacy interests in not having their identities disclosed in this context. In contrast, there is no public interest to be served by the disclosure of these employees' names and/or identifying information because their identities, by themselves, would not demonstrate how the FBI performed its statutory mission and thus, would not significantly increase the public's understanding of the FBI's operations and activities. Accordingly, the FBI properly protected these employees' privacy interests pursuant to FOIA Exemptions 6 and 7(C).t

63.     Similarly, responsive material sent to CBP, ICE and DOJ-CRM for consultation contains information related to non-FBI federal government personnel also and these agencies have requested the FBI to apply this exemption on these pages and to relay, within the FBI's declaration, CBP, ICE, and DOJ's assertion of these exemptions to justify their withholdings.

The same rationale discussed above applies to these OGAs' equities for protecting non-FBI federal government personnel.

64.     Responsive material sent to DOD for consultation also contains information related to non-FBI federal government personnel. DOD cited (b)(6) alone, with the justification as follows: "With the exception of senior decision-makers, DoD has a practice of withholding personally identifying information of its employees—that is, those members of the DoD who are at the military rank of Colonel or below and at the rank of GS-15 or below. *See O'Keefe v. DoD*, 463 F. Supp. 2d 317, (E.D.N.Y. 2006) (holding that "the probative value of this personally identifying information is nominal and does not overcome the privacy interest of the employees involved. The employee who signed for the memorandum is a security officer within the Office of the Joint Chiefs of Staff.)

65.     The rationale for this practice is that disclosing the names of the individuals involved could subject such individuals to annoyance or harassment in their private lives. Thus, this practice protects significant personal privacy interests. Moreover, release of this individuals' name would not meet the Supreme Court's public interest determination for the FOIA, as it would not show "what the government is up to." *See Dep't of Justice v. Reporters Committee for Freedom of the Press*, 489 U.S. 749, 780 (1989). Under the Reporters' Committee test, low level employees are not the decision makers who are typically held accountable by the public, the identity is not typically relevant or of interest to the public. Thus, the minimal public interest in this information does not outweigh the personal privacy interest of this employee in maintaining the anonymity in connection with their work for senior decision-makers on potentially controversial issues.

66.     Accordingly, DoD consistently redacts personally identifying information of the members of DoD who meet the Reporters' Committee test. This redaction involved the name and phone number of an individual.

*(b)(6)-4 and (b)(7)(C)-4: Names and Identifying Information of Third Party Individuals Merely Mentioned*

67.     In Exemption category (b)(6)-4 and (b)(7)(C)-4 the FBI withheld the names and identifying information of third parties who were merely mentioned in the investigative records responsive to Plaintiff's request. The FBI has information about these third parties in its files because these individuals were tangentially mentioned in conjunction with FBI investigative efforts. These individuals were not of investigative interest to the FBI. These third parties maintain substantial and legitimate privacy interests in not having this information disclosed and thus, being connected with an FBI law enforcement matter. Considering the FBI is an investigative and intelligence agency, disclosure of these third parties' names and/or identifying information in connection with an FBI investigation carries an extremely negative connotation. Disclosure of their identities would subject these individuals to possible harassment or criticism and focus derogatory inferences and suspicion on them. The FBI then considered whether there was any public interest that would override these privacy interests, and concluded that disclosing information about individuals who were merely mentioned in an FBI investigative file would not significantly increase the public's understanding of the operations and activities of the FBI. Accordingly, the FBI properly protected these individuals' privacy interests pursuant to FOIA Exemptions 6 and 7(C).

68.     These investigations lasted approximately 5 years and within that timeframe the FBI encountered many individuals who were not deemed direct subjects of investigation, but nonetheless found themselves in the orbit of this case. Despite the age of the documents, these individuals maintain substantial and legitimate privacy interests in avoiding disclosure of this information and thereby being connected with a criminal and/or national security investigation. Disclosure of these individuals' names and/or identifying information in connection with an FBI investigation carries an extremely negative connotation and would subject them to possible harassment, criticism, derogatory inferences, or suspicion. The FBI also considered whether there was any public interest that would override these privacy interests, and concluded that disclosing information about individuals merely mentioned in an FBI file would not significantly increase the public's understanding of the operations and activities of the FBI. Accordingly, the FBI properly asserted Exemptions 6 and 7(C) to protect this type of information.

69.     Similarly, responsive material sent to CBP and ICE for consultation contains information related to third-party individuals merely mentioned also and these agencies have requested the FBI to apply this exemption on these pages and to relay, within the FBI's declaration, CBP's assertion of these exemptions to justify their withholdings. The same rationale discussed above applies to these OGAs' equities for protecting third-party individuals merely mentioned.

*(b)(6)-5 and (b)(7)(C)-5: Names and Identifying Information of Local Law Enforcement Personnel*

70.     In Exemption category (b)(6)-5 and (b)(7)(C)-5 the FBI withheld the names and identifying information of local law enforcement personnel who provided assistance to the FBI

during its investigations. These individuals assisted the FBI in their official capacities and were able to do so due to their employment. Identifying them in this context (within law enforcement records) could subject them to unofficial inquiries for information related to their assistance, not anticipated by their contact with the FBI. Additionally, they could be targeted for retaliation by investigative subjects, those hostile to the FBI, or those who disparage cooperation with law enforcement, as a result of their cooperation. Thus, these individuals maintain substantial privacy interests in not being disclosed in this context. In contrast, there is no public interest to be served by publicly disclosing their identities as doing so would not increase public understanding of FBI operations and activities. Accordingly, the FBI protected these individuals' names and identifying information pursuant to Exemptions 6 and 7(C).

*(b)(6)-6 and (b)(7)(C)-6: Names and Identifying Data of Third Party Individuals of Investigative Interest*

71.     In Exemption category (b)(6)-6 and (b)(7)(C)-6, the FBI withheld the names and identifying information of third parties who were of investigative interest to the FBI. Being identified as a subject of FBI investigative interest carries a strong negative connotation and a stigma, whether or not these individuals ever committed criminal acts. Release of the identities of these individuals to the public could subject them to harassment or embarrassment, as well as undue public attention. Furthermore, it could result in professional and social repercussions, due to resulting negative stigmas. Accordingly, the FBI determined these individuals maintain substantial privacy interests in not having their identities disclosed. In contrast, disclosing personal information about these individuals would not significantly increase the public's understanding of the FBI's performance of its mission and so the FBI concluded that there was

no public interest here sufficient to override these individuals' substantial privacy interests. For these reasons, the FBI properly withheld this information pursuant to Exemptions 6 and 7(C).

72.     Similarly, responsive material sent to CBP and ICE for consultation contains information related to third party individuals of investigative interest also and these agencies have requested the FBI to apply this exemption on these pages and to relay, within the FBI's declaration, CBP and ICE's assertion of these exemptions to justify their withholdings. The same rationale discussed above applies to these OGAs' equities for protecting third party individuals of investigative interest.

*(b)(6)-7 and (b)(7)(C)-7: Names and Identifying Information of Third Party Individuals Who Provided Information to the FBI*

73.     In Exemption category (b)(6)-7 and (b)(7)(C)-7 the FBI withheld the names and identifying information of third party individuals who were interviewed by the FBI (and subsequently provided information) during the course of the FBI's investigations of the national security matter in this case. The identifying information of, and information provided by, these third-party individuals appears within the FBI's files because these individuals willingly divulged information relevant to FBI investigative efforts. These individuals were not of investigative interest to the FBI. Plaintiff has not provided a privacy waiver from the third parties authorizing release of their information, nor has Plaintiff supplied proof of death; therefore, these individuals maintain substantial and legitimate privacy interests in not having their cooperation or connection to FBI law enforcement matters disclosed. Considering the FBI is an investigative and intelligence agency, disclosure of these individuals' names and/or identifying information in connection with FBI records carries an extremely negative connotation.

40

74.     Disclosure of the identities of individuals who willingly provide information to the FBI could subject these individuals to harassment or embarrassment, undue public attention, and/or unwanted inquiries for information related to their assistance. They could also be targeted for retaliation by investigative subjects or by those who simply disparage cooperation with law enforcement. Exposure of a third party's cooperation with law enforcement could also lead to legal or economic detriment, negative professional and social repercussions, possible physical harm, or even death. Thus, the FBI has determined these individuals maintain substantial privacy interests in not having their identities disclosed.

75.     In contrast, the FBI could identify no public interest in the disclosure of this information because disclosure of these individual's names and identifying information would not shed light on or significantly increase the public's understanding of the operations and activities of the FBI. The FBI concluded the non-existent public interest here was insufficient to override theses individuals' substantial privacy interests; therefore, the FBI properly protected these individuals' privacy interests pursuant to Exemptions 6 and 7(C). The FBI is also relying on Exemption 7(D) to protect this information in many instances.

EXEMPTION 7(D) – CONFIDENTIAL SOURCE INFORMATION

76.     Exemption 7(D) exempts "records or information compiled for law enforcement purposes" when disclosure:

> could reasonably be expected to disclose the identity of a confidential source, including a State, local or foreign agency or authority or any private institution which furnished information on a confidential basis, and, in the case of a record or information compiled by a criminal law enforcement authority in the course of a criminal investigation, or by an

agency conducting a lawful national security intelligence investigation, information

furnished by a confidential source.

5 U.S.C. § 552(b)(7)(D).

77.    Numerous confidential sources report to the FBI on a regular basis; they provide

information under express assurances of confidentiality and are "informants" within the common

meaning of the term. Others are interviewed and/or provide information under implied

assurances of confidentiality (i.e., under circumstances from which assurances of confidentiality

may be inferred). In either situation, these sources are considered to be confidential because they

furnish information only with the understanding that their identities and the information they

provided will not be divulged outside the FBI. Information provided by these sources is singular

in nature, and if released, could reveal their identities. The FBI has learned through experience

that sources assisting, cooperating with, and providing information to the FBI must be free to do

so without fear of reprisal. The FBI has also learned that sources must be free to furnish

information to the FBI with complete candor and without the understandable tendency to hedge

or withhold information because of fear that their cooperation with the FBI will later be made

public. Sources providing information to the FBI should be secure in the knowledge that their

assistance and their identities will be held in confidence.

78.    The release of a source's identity would forever eliminate that source as a future

means of obtaining information. In addition, when the identity of one source is revealed, that

revelation has a chilling effect on the activities and cooperation of other sources. Such a result

undermines one of the FBI's most important means of collecting information and could thereby

severely hamper law enforcement efforts to detect and apprehend individuals engaged in the violation of federal criminal laws.

*(b)(7)(D)-1: Names, Identifying Data and/or Information Provided by Individuals Under an Express Assurance of Confidentiality*

79.    Within Exemption category 7(D)-1, the FBI protected the names, identifying information of, and information provided by third parties to the FBI under express grants of confidentiality. When processing the records at issue, the FBI found evidence these individuals, who provided specific and detailed information that is singular in nature, either requested their identities not be revealed; and/or FBI investigators would have, by standard practice, expressly promised these third parties their identities and the information they provided would remain confidential.

80.    Providing express assurances of confidentiality is essential to the FBI's ability to obtain relevant and accurate information from Confidential Human Sources (CHSs). Without these assurances by the FBI, those with access to information critical to FBI investigations may be reluctant to provide information or may modify their statements to lessen the severity of any backlashes; therefore, the FBI must provide credible assurances of confidentiality to these individuals in order to obtain factual, relevant, and timely information. Release of these sources' identities and/or any singular information they provided may lead to the revelation of their identities and would also display unwillingness by the FBI to honor its assurances of confidentiality to current and future CHSs. Therefore, releasing this information would have a lasting negative impact on the FBI's informant program – it would greatly hinder the FBI's

ability to recruit and maintain CHSs willing to provide accurate and relevant information pertaining to criminal activities.

81.     The FBI was able to determine its investigators granted certain individuals within the records at issue express assurances of confidentiality because it located positive indicators they were official, established FBI informants. In some instances, sources were described as being "Confidential Human Sources" or "Cooperating Witnesses" (CWs). These designations of CW or CHS are positive indications these individuals entered into official, confidential relationships with the FBI in which they would have, by standard FBI practice, been provided with express assurances of confidentiality. In other instances, the FBI located sources given source file numbers and source symbol numbers.[17]  Official FBI informants are given informant files to house the information they provide during their work as confidential informants. Thus, the existence of a source file number used to house information provided by an individual can be seen as proof the individual was an official, established confidential source, and received an express grant of confidentiality. Another indication of official informant status is the replacement of an individual's name with a symbol source number, a tool used by FBI investigators to hide the identities of its formally-established, confidential informants within FBI records. Thus, the use of a symbol source number is also a positive indication sources were officially established and supplied with express grants of confidentiality.

82.     In addition, responsive material sent to DOJ-CRM for consultation contains information related to foreign government agencies under express promises of confidentiality,

---

[17] *See* ¶¶ 84 *infra* for further description of source symbol numbers

and DOJ has requested the FBI to apply this exemption on these pages and to relay, within the

FBI's declaration, DOJ's assertion of this exemption to justify protected information provided

from a foreign agency or authority with an explicit understanding of confidentiality. The release

of official United States Government documents that reveal the existence of a confidential

relationship with a foreign government reasonably could be expected to strain relations between

the United States and the foreign governments and lead to diplomatic, political or economic

retaliations. A breach of this relationship can be expected to have at least a chilling effect on the

free flow of vital information to the United States law enforcement agencies, which may

substantially reduce their effectiveness. Accordingly, the FBI properly withheld this information

on behalf of DOJ under FOIA Exemption 7(D).

*(b)(7)(D)-3: Confidential Source Symbol Numbers*

83.     In Exemption category 7(D)-3, the FBI protected the permanent source symbol

numbers given to FBI confidential human sources (CHSs). The FBI assigns permanent source

symbol numbers in sequential order to CHSs who report information to the FBI on a regular

basis under express assurances of confidentiality. In this case, the FBI did not refer to the

confidential sources by their true names. Instead, theses sources were referred to only by their

individually assigned permanent source symbol numbers, in order to further protect their

identities within FBI communications. The FBI obtained information from these confidential

sources relevant to the investigations discussed within the records at issue.

84.     If the FBI disclosed the confidential source symbol numbers of these informants,

their identities could be ascertained by persons knowledgeable of the FBI's investigations and

the events and subjects involved. This is because these singular numbers are assigned to specific

individuals. Repeated release of their numbers, within the context of certain events/in association with certain singular information, could enable criminals and those familiar with these matters to pinpoint who could possibly have been present at certain events or could possibly have known different pieces of information.

85.    Furthermore, once sources' identities were discerned, the informants, as well as their families, could be subjected to embarrassment, humiliation, and/or physical or mental harm. Moreover, the disclosure of a CHS's identity would likely portray the FBI as unwilling to protect its CHSs from exposure and/or negligent in honoring its promises to keep CHSs' identities confidential. This could dissuade current and future potential CHSs with access to critical intelligence from cooperating with FBI investigators. The FBI has found that it is only with the understanding of complete confidentiality that the aid of such informants can be enlisted, and only through this confidence that informants can be persuaded to continue providing valuable assistance in the future. Accordingly, as release of symbol source numbers could endanger current/past FBI CHSs and their families, and could harm the FBI's ability to recruit and maintain CHSs, the FBI properly withheld this information pursuant to FOIA Exemption 7(D).

*(b)(7)(D)-5: Names, Identifying Data and/or Information Provided by Individuals under an Implied Assurance of Confidentiality*

86.    In Exemption category 7(D)-5, the FBI protected the names, identifying information of, and information provided by third parties under circumstances in which confidentiality can be inferred. These third parties provided information concerning the activities of subjects who were of investigative interest to the FBI. The FBI considered 1) the singularity of the information provided and the likelihood these individuals could be identified through

release of this information by those familiar with the events described; 2) the proximity of these sources to the investigative subjects and events they described; and 3) and the nature of the criminal acts they described. Based on these factors, the FBI inferred these individuals provided this information to the FBI only because they believed their cooperation with the FBI, and the information they provided (outside of its investigative use), would remain confidential.

87.    The FBI protected the identifying information of, and information provided by, individuals who conveyed critical information regarding potential criminal acts. These individuals were in a position to have ready access to and/or knowledge about investigative targets and others involved in the national security investigations. Such access exposed them to potentially significant harms should their association and cooperation with the FBI be publicly disclosed. One reason they risked harm when cooperating is they were within the orbit of suspected criminals, and such criminals (in the FBI's experience) typically seek to deter informants' cooperation with law enforcement through reprisal. Such reprisal can take many forms, to include defamation of the source's character among their peers/family; economic reprisal (deprivation of employment/business opportunities); violent threats aimed at instilling fear and doubt; or even violence itself (physical harm/murder). Considering these criminals already displayed/were believed by the sources to have a propensity towards violence, these sources likely feared violent reprisal. Furthermore, harm could result simply from the fact they cooperated with law enforcement. Some individuals/communities are suspicious of law enforcement and see cooperation with law enforcement among their peers as a betrayal of trust. Thus, these sources also risked being alienated by their friends and within their communities when they decided to provide information to the FBI. Even amidst these potential harms, these

47

third party sources provided specific, detailed information that is singular in nature – i.e., only a few individuals would be privy to such information. Thus, the FBI determined disclosure of the identities of these sources and the information they provided could subject these third parties, as well as their families, to retaliation or backlash, should their information be disclosed.

88.    These individuals provided information over a period of time that had proven to be reliable. They were in positions where they had ready access to and/or knowledge about the investigative matter at issue in this case (that remains classified). These individuals' access to the specifics of these crimes was an invaluable resource for the FBI in investigating this case. Such access exposed them to potential significant harms should their association and cooperation with the FBI be publicly disclosed. These third party sources provided specific detailed information to the FBI that was singular in nature and at times, despite a fear for their life in reprisal for the information they were providing concerning the activities of specific individuals of investigative interest to the FBI. The disclosure of the identities of these sources and the information they provided could have dire consequences because disclosure could subject these third parties, as well as their families, to embarrassment, humiliation, and/or physical or mental harm. These third parties provided information of value to the FBI concerning its investigations, and in doing so, placed themselves in harm's way should their identity and cooperation with the FBI become known. Under these circumstances, it is reasonable to infer that these third parties cooperated with the FBI only with the expectation of confidentiality.

89.    Considering the circumstances described above, it is reasonable to infer these third parties cooperated with the FBI only because they expected their identities and the

information they provided would be held in confidence. Therefore, the FBI properly protected

the sources' identities and the information they provided pursuant to Exemption 7(D).

EXEMPTION (B)(7)(E) INVESTIGATIVE TECHNIQUES AND PROCEDURES

90.     FOIA Exemption (b)(7)(E) provides protection for:

law enforcement records [which]…would disclose techniques and procedures for

law enforcement investigations or prosecutions, or would disclose guidelines for

law enforcement investigations or prosecutions if such disclosure could

reasonably be expected to risk circumvention of the law.

5 U.S.C. § 552(b)(7)(E).

91.     The FBI asserted Exemption (b)(7)(E) to withhold information from these

records, the release of which would disclose techniques and/or procedures for law enforcement

investigations or prosecutions or would disclose guidelines for law enforcement investigations or

prosecutions if such disclosure could reasonably be expected to risk circumvention of the law.

92.     Within the responsive documents, the FBI applied Exemption (b)(7)(E) to non-

public investigative techniques and procedures utilized by the FBI to pursue its law enforcement

mission, and also to non-public details about techniques and procedures that are otherwise

known to the public. Specifically, the FBI asserted Exemption 7(E) to protect the following

categories of information.

*(b)(7)(E)-2: Collection and Analysis of Information*

93.     In Exemption category 7(E)-2, the FBI protected the methods the FBI uses to

collect and analyze information it obtains for investigative purposes. The release of this

information would disclose the identity of methods used in the collection and analysis of

49

information, including how and from where the FBI collects information and the methodologies employed to analyze it once collected. These methods are still in use today.

94.     Disclosures would enable subjects of FBI investigations to circumvent these or similar currently used techniques. The relative utility of these techniques could be diminished if the actual techniques were released in this matter. This in turn would facilitate the accumulation of information by investigative subjects regarding the circumstances under which the specific techniques were used or requested and the usefulness of the information obtained. Release of this type of information would enable criminals to educate themselves about the techniques employed for the collection and analysis of information and therefore allow these individuals to take countermeasures to circumvent the effectiveness of these techniques and to continue to violate the law and engage in intelligence, terrorist, and criminal activities. Accordingly, the FBI has properly withheld this information pursuant to FOIA Exemption 7(E).

*(b)(7)(E)-3: Sensitive Non-Public Investigation Code Names*

95.     In Exemption category (b)(7)(E)-3, the FBI withheld non-public details about investigation code names used by the FBI and described in the records responsive to Plaintiff' request. The FBI relies on code names as a useful investigative technique to conduct investigations. Although it is publicly known the FBI used code names in investigations, the specific details of these particular code names are not known. In effective FBI investigations, it is key that the subjects of the investigations and the public are unaware of that investigations; therefore, publicizing details concerning unknown FBI code names within these investigations would harm the FBI's ability to carry out its law enforcement mission. If the FBI disclosed these non-public code names, it could have devastating operational consequences as it would reveal a

technique of continuing value to the FBI for sensitive investigations. Public disclosure of a code name would allow a criminal, adversary, or other individual to patch bits and pieces of information together to assess how code names are used and tie investigative activities to particular investigations, jeopardizing future use of code names by the FBI in similar cases or under similar circumstances. While disclosure of a case code name within the context of the investigation to which it refers may not seem harmful, this information could be pieced together with public code names to reveal investigative associations. This could enable individuals to connect subjects and investigations, forming a matrix of information that would reveal the extent of investigative information the FBI has compiled, and the focus of its investigative efforts. Thus, disclosure of these details would hinder the FBI's use of a valuable investigative technique and risk circumvention of the law by individuals seeking to evade the FBI's investigative focus. Accordingly, the FBI properly asserted FOIA Exemption 7(E) to protect this information. This information is also cited in conjunction with FOIA Exemptions 1 and 3.

*(b)(7)(E)-4: Classified Law Enforcement Techniques Utilized to Conduct National Security Investigations*

96.    In Exemption category 7(E)-4, the FBI protected sensitive investigative techniques used to conduct national security investigations, in conjunction with FOIA Exemptions 1 E.O. 13526, § 1.4(b), (c) and 3 50 U.S.C. § 3024(h)(1). Due to the nature of these techniques, they qualify for protection pursuant to FOIA Exemption 7(E) as they are non-public law enforcement techniques, the release of which would enable criminals to circumvent the law; but they also qualify for protection pursuant to Exemptions 1 and/or 3 as they are also intelligence gathering sources and methods used in a national security context. These

51

investigative techniques are highly sensitive and releasing additional information about them or discussing them in greater detail here would reveal their very nature, and when and how they are utilized by the FBI in criminal and national security investigations. This would enable criminals and foreign adversaries targeted by these techniques to predict and circumvent their use by the FBI. As such, the FBI asserted Exemption 7(E), in conjunction with Exemptions 1 and 3, to protect these sensitive national security investigative techniques

*(b)(7)(E)-5: Identity and/or Location of FBI or Joint Units and Squads*

97.    In Exemption category 7(E)-5, the FBI protected methods and techniques involving the location and identity of FBI units, squads and divisions involved in the national security investigations. Such office locations and units, squads, and divisions are usually found in the administrative headings of internal FBI documents. These headings identify the locations of the office and units, squads, and divisions that originated or received the documents, and these units/squads/divisions are still in use today. Disclosure of the location of these units, squads and divisions conducting the investigations would reveal the targets, the physical areas of interest of the investigations, and when taken together with the other locations if identified, could establish a pattern or "mosaic" that identification of a single location would not. If the locations are clustered in a particular area, it would allow criminals to avoid those locations, especially if one or more locations appeared with frequency or in a pattern. This would disrupt the method of the investigative process and deprive the FBI of valuable information.

98.    The withholding of the specific units, squads and divisions involved is justifiable as well under a similar rationale. Once identified, the units', squads' and divisions' areas of expertise would become known and the targets of the investigations would be able to discern the

investigative strategies deployed by the FBI. For example, knowing that a unit whose focus is on financial crimes is involved in an investigation is quite different information than knowing that the unit involved has a focus on crimes of violence. This knowledge could allow a subject to employ countermeasures targeted toward concealing particular types of behavior and/or allow them to make informed decisions to avoid altogether certain activities in a particular location. Furthermore, certain FBI units/squads are highly specialized, and are involved in deploying particular investigative techniques and procedures. Revealing their involvement in an investigation would reveal non-public details concerning which techniques and procedures were deployed in certain investigative circumstances, and subsequently allow for criminals to predict the FBI's use of these techniques and procedures in similar investigative circumstances. This would allow for them to discover and circumvent the deployment of these techniques and procedures, greatly reducing their effectiveness.

99.     In summary, the FBI withheld the involvement of particular units, squads and divisions to prevent criminals from adjusting their behavior and activities to circumvent FBI law enforcement efforts. Accordingly, the FBI properly asserted Exemption 7(E) to withhold this information.

*(b)(7)(E)-6: Dates and Types of Investigations (Preliminary or Full Investigations)*

100.    In Exemption category 7(E)-6, the FBI withheld information pertaining to the types and dates of investigations referenced in the records at issue in this case. Specifically, some of the information withheld, when referenced in connection with actual investigation and not in general discussion, pertains to the type of investigation, whether it is a "preliminary" or "full" investigation and the dates the FBI initiated the investigations. Disclosure of this information

would inform criminals the types of activities that would trigger a full investigation as opposed to a preliminary investigation, and the particular dates the investigations cover. Additionally, this information would also give criminals valuable insight into how the FBI develops its investigations. Release of this information would allow investigative subjects to predict FBI investigative strategies and adjust their behavior accordingly. Moreover, revealing a specific activity in general warrants investigation could likewise cause individuals to adjust their conduct to avoid investigative scrutiny by the FBI.

101. Within this category, the FBI also protected the categorization of sensitive FBI investigations. The specific type of investigation pursued to investigate certain matters is often highly sensitive. This is because internal FBI policies establish which types of investigative techniques are authorized for use in certain types of investigations. Thus, revealing how investigations are categorized by FBI personnel would reveal the investigative "toolbox" available to the FBI in certain situations.

102. Releasing these investigation types would allow criminals to predict the FBI's responses and investigative strategies when pursuing certain types of criminal behavior/national security threats. Such a release would enable criminals to stay one step ahead of FBI investigators and enable them to circumvent the law. Furthermore, revealing this information would also show the types of criminal behavior and/or intelligence discovered by the FBI that predicated the initiation of the particular investigation types. This could potentially reveal to criminals and national security threats key information about the FBI's intelligence sources and methods, and/or the FBI's capabilities to gather evidence of potential criminal activities through various investigative techniques. Disclosure could thus reveal key information about the FBI's

54

investigative capabilities, allowing criminals to educate themselves on how they might avoid detection and/or disruption of their activities by FBI investigators.

103. In summary, disclosure of information related to the types and timing of investigations could enable criminals to time and structure their illegal activities accordingly to circumvent the FBI's attempts to enforce federal laws; therefore, the FBI has properly withheld this information pursuant to Exemption 7(E).

*(b)(7)(E)-7: Investigative Focus of Specific Investigations*

104. In Exemption category 7(E)-7, the FBI protected the focuses of specific FBI national security investigations. These focuses have not been publicly disclosed. Revealing this information to investigative targets would alert them to the FBI's interest in their activities, allowing them to take active measures to conceal/destroy evidence or modify their behavior to avoid future investigative scrutiny. Additionally, revealing the broader investigative focuses of interconnected national security investigations would reveal the scope of the FBI's gathered evidence/intelligence on national security, connections it has discovered between different adversaries, and the strategies it plans to pursue to prevent or disrupt further national security threats. This would allow these adversaries to predict the FBI's investigative strategies, and modify their activities or operation security measures to thwart FBI investigative efforts. Additionally, release of this information in the context of the investigative records at issue would provide adversaries a preview of how the FBI will respond to similar investigative situations, allowing them to preemptively deploy countermeasures to disrupt FBI investigative efforts of their own, unrelated activities.

105.     Release of this type of information would also reveal key information about FBI intelligence gathering capabilities. Revealing when and why the FBI pursues or shifts investigative focuses would reveal key information about the types of investigative intelligence the FBI possessed at particular points in time, and possibly when and how such information was obtained. This could enable adversaries to discover non-public details about FBI intelligence/evidence gathering methods, and help them determine how they might modify their operational security to deprive the FBI of such critical intelligence/evidence.

106.     In summary, releasing the focus of specific FBI [investigation type] investigations would allow targets of these investigations to thwart FBI efforts to investigate/disrupt their activities; stunt the FBI's broader strategies for pursuing interrelated investigations; provide key information about FBI investigative strategies for pursuing [investigation type] investigations; and reveal key information about the FBI's intelligence/evidence gathering capabilities. Therefore, as release of this information would enable criminals to circumvent the law, the FBI withheld this information pursuant to Exemption 7(E).

### *(b)(7)(E)-8: Database Information, Results, and/or Printouts*

107.     In Exemption category 7(E)-8, the FBI and at times as requested by CBP and ICE protected database search results located through non-public databases used for official law enforcement purposes by the FBI and other federal, state and local law enforcement personnel. These non-public databases serve as repositories for counterterrorism and investigative data. They are essentially "one-stop" shops that allow law enforcement to query information and develop investigative leads from a variety of data sources using state-of-the-art analytical tools. U.S. Government personnel as well as task force members from local, state and other federal

agencies may have access to these databases on a need-to-know basis. Similarly, at times when the FBI determines a database is sensitive enough to warrant protection under the FOIA, it does not divulge the name of that database as that would undermine the very reasoning for withholding the name and/or search results from that database. Consequently, disclosure of the printouts or information compiled from these search results could enable criminals to employ countermeasures to avoid detection, thus jeopardizing the FBI's investigative mission and at times CBP and ICE's law enforcement mission. Because disclosure would impede these agencies' effectiveness and potentially aid in circumvention of the techniques if disclosed, the FBI on its own behalf, and at times as requested by CBP and ICE, properly asserted Exemption 7(E) to protect this information. The FBI on its own behalf and at times as requested by CBP and ICE, also relied on Exemptions 6 and 7(C) in some instances to protect information in these records.

108.     Specifically, CBP and ICE advised the FBI to protect computer function codes associated with such databases/computer systems. These computer function codes instruct users on how to navigate their way through the database/systems. The public has no interest in these internal computer codes, as the codes are used exclusively for the purposes of indexing, storing, locating, retrieving, and distributing information in such databases/systems, and public access is not permitted. Disclosure of the codes to the public could expose such databases/systems to efforts to obtain unauthorized access, as computer literate individuals could use the codes to deduce information about the structure of the system. Disclosure of the codes could also facilitate unauthorized access to such databases/systems, allow criminals to conceal their activities, and interfere with investigations and law enforcement activities. Because disclosure

would impede the effectiveness of CBP and ICE, the FBI properly asserted Exemption 7(E) as requested by these agencies to protect this information.

*(b)(7)(E)-11: Information Related to Polygraphs*

109.    In Exemption category 7(E)-11, the FBI protected procedures and techniques used by FBI investigators to conduct polygraph examinations, to include detailed non-public information about the use of operational polygraphs. While the FBI's use of polygraph examinations is publicly known, the details of the FBI's methodology for conducting polygraphs is highly guarded information.

110.    Disclosure of this information could enable individuals subject to polygraph examinations – including applicants, employees, and individuals involved in law enforcement investigations – to educate themselves about pre-employment and operational polygraph examinations and develop countermeasures to circumvent the effectiveness of the examinations. For example, revealing the types of questions asked during certain types of polygraphs would allow examinees to prepare their answers ahead of time, and practice hiding their deception from polygraphers.

111.    Furthermore, revealing any details of how polygraphers administer polygraphs and interpret polygraph results would allow examinees an idea of how they might effectively deceive FBI polygraphers, and circumvent the law enforcement purpose of polygraph examinations. In this manner, the relative benefit of polygraph examinations would be diminished by disclosure of the actual techniques and procedures employed by the FBI. Thus, the FBI properly protected this information from disclosure pursuant to FOIA Exemption 7(E).

*(b)(7)(E)-12: Monetary Payments for Investigative Techniques*

58

112.    In Exemption category 7(E)-12, the FBI withheld monetary amounts requested by FBI personnel and/or paid by the FBI in order to implement particular investigative techniques. The FBI has limited resources that it must allocate strategically in order to effectively pursue its law enforcement and intelligence gathering missions.

113.    Revealing the amount of money the FBI has paid or plans to pay in order to implement certain investigative techniques would reveal the FBI's level of focus on certain types of law enforcement or intelligence gathering efforts. Revealing this level of focus would reveal how the FBI plans to allocate its limited resources and essentially paint a picture as to where the FBI's strengths and weaknesses lie within the spectrum of illegal activities it is mandated to investigate. Releasing this information would give criminals the opportunity to structure their activities in a manner which avoids the FBI's strengths and exploits its weaknesses. Because release of this type of information would enable criminals to circumvent the law, this information has been redacted pursuant to Exemption 7(E).

*(b)(7)(E)-13: Information Regarding Targets and Scope of Surveillance*

114.    In Exemption category 7(E)-13, the FBI withheld information concerning the targets, locations, monitoring, and types of devices utilized in surveillance operations conducted by the FBI in relation to the investigations at issue here. The FBI utilized these surveillance techniques to obtain investigative intelligence relevant to the national security investigations. The law enforcement techniques used to conduct these surveillance operations are techniques currently utilized by the FBI in current criminal and national security investigations today.

115.    Certainly, it is publicly known the FBI and other law enforcement agencies engage in different types of surveillance in investigations. However, disclosure of non-public

details about who, when, how, and under what circumstances the FBI conducts surveillance would allow current and future subjects of FBI investigations and other potential criminals to develop and utilize countermeasures to defeat or avoid different types of surveillance operations, thus rendering the techniques useless to the FBI and other law enforcement agencies. This is especially true because the success of investigative surveillance hinges on investigators' abilities to remain undetected. Revealing any non-public details about the FBI's methodology for conducting surveillance could potentially jeopardize the FBI's ability to operate surveillance covertly, and risks circumvention of the law. Accordingly, the FBI properly asserted Exemption 7(E) to withhold this information.

*(b)(7)(E)-14: Internal FBI Secure Fax Number/Telephone Number, Email or IP Address, Intranet/Web Address/URL*

116.    In Exemption category 7(E)-14, the FBI withheld secure fax numbers, non-public intranet web addresses, and telephone numbers. More specifically, this type of information could provide criminals with specific targets for possible cyber-attacks and other types of attacks on FBI secure communications. Considering the current cyber-security environment where government data breaches and other hacking attempts on government systems are prevalent, it is likely that the release of this type of information could provide hackers with avenues to exploit the FBI's Information Technology system. It is possible they could use this information to gain unauthorized access to FBI systems, view and/or manipulate sensitive investigative data, interfere with the FBI's non-public intranet protocol, and/or hinder the FBI's ability to enforce the law by disrupting the FBI's internal communications. Releasing this information poses substantial risks to FBI information systems, could potentially decrease the FBI's effectiveness,

and could enable criminals to circumvent the law. Accordingly, the FBI asserted Exemption 7(E) to withhold this information.

*(b)(7)(E)-15: Computer Analysis Response Team (CART) Reports and/or Data*

117.    In Exemption category 7(E)-15, the FBI protected reports and/or data resulting from the FBI's analysis of digital media collected during the investigations memorialized in the records at issue. The FBI's Computer Analysis Response Team (CART) provides digital forensics, technical capabilities, and related services and support to the FBI, intelligence organizations and other law enforcement agencies. CART provides support to investigations that are reliant, in whole or in part, upon digital evidence, namely through the acquisition, preservation, examination processing, and presentation of digital information stored in computers or other electronic devices or media. CART analyzes a variety of digital media, including, but not limited to, desktop and laptop computers, Compact Disks (CDs)/Digital Video Disks (DVDs), cell phones, digital cameras, digital media players, flash media, and other digital media storage devices.

118.    CART examiners are experts at extracting data from digital media. Providing detailed information about CART software, equipment, techniques, procedures, and/or types of reports generated by CART during their forensic testing processes would impede the FBI's effectiveness in investigating crimes where evidence can be found on computers and other digital media. It would also aid in circumvention of the law by providing criminals the information necessary for them to adjust behavior in order to avoid detection. For example, once it is known that the FBI has the ability to penetrate the security of a device, criminals would be able to shore up those vulnerabilities by developing and/or utilizing technology less susceptible to law

enforcement detection, penetration, or scrutiny, and then use or develop that technology to counteract the techniques used by CART. Accordingly, the FBI properly withheld this information pursuant to Exemption 7(E) in conjunction at times with Exemptions 6 and 7(C).

*(b)(7)(E)-16: Operational Directives*

119.    Within Exemption category (b)(7)(E)-16, the FBI protected operational directives that not only describe non-public FBI investigative procedures, techniques, and strategies, but also instruct FBI employees on the proper use of these procedures, techniques, and strategies. If revealed in their entirety, these descriptions would provide individuals and entities with insight into the standards the FBI follows when conducting investigations, and the suite of investigative tools its likely bring to bear in particular circumstances. This would give criminals the ability to preemptively modify their behavior in a manner which avoids detection and disruption by the very investigative procedures, techniques, and strategies which these operational directives are intended to regulate. Moreover, the fact that these operational directives consolidate diverse sources of information makes their complete revelation even more problematic. While different entities and individuals may lack the capacity to gather discrete pieces of information to form a picture of the FBI's strategies, these operational directives do that work for them. Consequently, the release of these operational directives would increase the risk that targets of investigations could avoid detection or develop countermeasures to circumvent the ability of the FBI to effectively use these important national security and law enforcement techniques. Essentially, release of such operational directives would reveal the FBI's overarching investigative strategies in pursing different types criminal and national security investigations. Such a release would inform entities and individuals seeking to commit crimes or threaten the United States' national

security, the investigative steps FBI will take in when and how they should modify their behaviors to avert the FBI's attempts to detect and/or disrupt their activities. As release of such information would greatly increase the risk that potential lawbreakers would be able to evade detection and/or be emboldened to engage in criminal activities, this information has been redacted pursuant to FOIA Exemption 7(E).

*(b)(7)(E)-17: Tactical Information Contained in Operational Plans*

120.    In Exemption category 7(E)-17, the FBI protected details of FBI Operational Plans. These Operational plans are developed for the purpose of successfully executing arrests or other dangerous investigative actions. These plans often include strategies for surveillance, placement of personnel, communications during the operations, contingency/abort plans, administrative and equipment information, deadly force authorization information, targets' background information (maps, photographs, copies of warrants, indictments, etc.), local emergency medical facility information and routes, briefing/staging locations, and/or other specific instructions for the operations.

121.    If the details of such plans were publicly known, others targeted by similar operations could predict the FBI's strategies and bolster their operational security to avoid the FBI's attempts to arrest or investigative the targets further through such operations. Additionally, release of Operational Plans could potentially risk the lives of FBI agents and other law enforcement personnel executing these plans. Therefore, protection of the methodology and techniques utilized in these plans is essential in order to prevent future circumvention of the law by criminals since the FBI will use the same or similar techniques to bring similar future

investigations to successful conclusions. Thus, the FBI properly protected this information from disclosure pursuant to FOIA Exemption 7(E).

DOCUMENTS WITHIN THE SAMPLE REFERRED TO OGAS FOR CONSULTATION WITH THE FBI[18]

122.    The FBI also identified some pages containing information and/or equities originating with the Army, CBP, CIA, DOD, DOJ-CRM, DOS, ICE, Navy, and Treasury. In accordance with DOJ regulations, 28 C.F.R. § 16.4(d), the FBI consulted with these OGAs with equities in these documents to determine how they wanted the FBI to treat their information contained within the responsive FBI documents at issue here.

*Army*

123.    The FBI sent 6 pages of the sample to the Army for consultation. These pages are identifiable as STEIN-999-1001, 1073, and 1237-1238. On November 10, 2016, Army advised the FBI to portions of information on these pages pursuant to Exemptions 1, 3, and 7E of the FOIA. The justification for these withholdings is addressed in Army's *Vaughn* submission in this case. (*See* Exhibit B.)

*CBP*

124.    The FBI sent 7 pages of the sample to the CBP for consultation. These pages are identifiable as STEIN-4136-4138, 4799-4800, and 4803-4804. On December 6 & 7, 2017, CBP advised the FBI to withhold portions of the material in full pursuant to Exemptions 5, 6, 7(C),

---

[18] Upon determining that the FBI would need to review asserted withholdings since the filing of the agency's previous MSJ in this case, the FBI afforded the OGAs the opportunity to review their withholdings in the documents at issue and, on August 13, 2025, began coordinating these reviews. Following responses from these agencies, it was determined that all previous assertions remain unchanged.

and 7(E). After consulting with CBP, this agency advised it was no longer asserting Exemption 5 for any information on the above referred pages from the sample. The justification for the remaining withholdings is addressed in this declaration at ¶¶ 64, 70, 73, and 108-109.

*CIA*

125.    The FBI sent 22 pages of the sample to CIA for consultation. These pages are identifiable as STEIN-863, 868, 895-896, 898-900, 908, 910, 925-926, 937, 1062-1064, 1066-1067, 1072, 1191-1192, 1194, and 1239. On or about December 2016, CIA advised the FBI to withhold portions of the material in part or in full pursuant to Exemptions 1 and 3. The justification for these withholdings is addressed in this declaration at ¶¶ 19-22 and 36-40.

*DOJ-CRM*

126.    The FBI sent 143 pages of the sample to the DOJ-CRM for consultation. These pages are identifiable as STEIN-1292-1334, 1420-1454, 1474-1505, and 1511-1542. On or about January 2017, DOJ-CRM advised the FBI to withhold portions of the material in part pursuant to Exemptions 5, 6, 7(C), and 7(D). After consulting with DOJ-CRM, this agency advised it was no longer asserting Exemption 5 for information on pages STEIN-1293-1306, 1307-1331, 1422, 1423-1452, 1453-1454, 1474-1505, and 1511-1542 from the sample; however, these pages continue to be withheld in full pursuant to other exemptions discussed above. DOJ-CRM's *Vaughn* index in this case (*See* Exhibit C.) further details the agency's withholdings, and the justification for the remaining withholdings is addressed in this declaration at ¶¶ 46, 49, 64, 83.

*DOS*

127.    The FBI sent 50 pages of the sample to the DOS for consultation. These pages are identifiable as STEIN-684, 686, 788, 789, 818-824, 870-871, 891-892, 895, 898, 1071-1072,

1143, 1159-1160, 1235-1236, 1377, 1379, 1543, 1548, 1596, 1601, 1605, 1616, 1625, 2435, 2445, 2455, 2467, 2479, 2499, 2509, 2519, 2529, 2539, 4167, 4209-4210, 4214, and 4228-4229. On or about October, November 2016 and March 2017, DOS advised the FBI to withhold portions of the information in part pursuant to Exemptions 1, 6, 7(C), and 7(E). The justification for these withholdings is addressed in DOS's *Vaughn* submission in this case. (*See* Exhibit D.)

*ICE*

128.    The FBI sent 3 pages of the sample to ICE for consultation. These pages are identifiable as STEIN-4136-4138. On or about September, 2017, ICE advised the FBI to withhold information in full pursuant to Exemptions 6, 7(C), and 7(E). The justification for these withholdings is addressed in this declaration at ¶¶ 64, 70, 73, and 108-109.

*Navy*

129.    The FBI sent 44 pages of the sample to the Navy for consultation. These pages are identifiable as STEIN-867-868, 877-883, 922-923, 931-935, 937-943, 945, 997, 999, 1001, 1066, 1072-1073, 1109, 1112-1114, 1132, 1237-1239, 1277, 1590, 4166-4168, and 4383-4385. On or about November, December 2016, April, and May 2017, Navy advised the FBI to withhold portions of the material in part pursuant to Exemptions 1, 3, 6, 7(C), and 7(E). The justification for these withholdings is addressed in Navy's *Vaughn* submission in this case. (*See* Exhibit E.)

*Treasury*

130.    The FBI sent 1 page of the sample to the Treasury for consultation. This page is identifiable as STEIN-4214. On or about October, November 2016, and March 2017, Treasury advised the FBI to withhold portions of the material in part pursuant to Exemptions 6 and 7(C).

The justification for these withholdings is addressed in Treasury's *Vaughn* submission in this case. (*See* Exhibit F.)

*DOD*

131.    The FBI sent 5 pages of the sample and 2 pages from the supplemental contextual pages to the DOD for consultation. These pages are identifiable as STEIN-999-1001, 1237-1238, and STEIN-4244-a to 4244-b. On or about November, December 2016, May 2017, DOD advised the FBI to withhold portions of the material in part pursuant to Exemptions 1, 3, 6, 7(C), 7(E), and 7(F). The justification for part of the withholdings is addressed in this declaration at ¶¶ 65-67. The remaining withholdings are addressed in DOD's *Vaughn* submission in this case. (*See* Exhibit G.)

FORESEEABLE HARM STANDARD

132.    The FOIA Improvement Act of 2016 generally adopted the foreseeable harm standard and made it statutory, advising that agencies shall withhold information under the FOIA only if the agency reasonably foresees that disclosure would harm an interest protected by an exemption or disclosure is prohibited by law. Accordingly, the FBI's analysis of records responsive under the FOIA is a two-part process. First, the FBI determines whether a record (or a portion of a record) is exempt pursuant to one or more FOIA exemptions. Second, if the record (or portion thereof) is exempt pursuant to one or more FOIA exemptions, the FBI then considers whether foreseeable harm would result from disclosure of the record (or portion thereof). For the withheld records at issue here (or portions of withheld records), the FBI conducted this two-part analysis and only withheld records (or portions of records) where it determined the withheld

67

record (or portion) met both of these criteria. The FBI's foreseeable harm is more fully described within each of the above coded exemption justification categories.[19]

SEGREGABILITY OF THE SAMPLE

133.    As discussed in ¶ 6, *supra*, the FBI identified 2,537 responsive pages of the sample and additional context pages: 65 pages RIF, 902 pages RIP, and 1,570 pages WIF. Each of these categories is discussed below to further address segregability.

A. Pages RIF.   Following the segregability review, RIDS determined that 65 pages could be released in full without redaction as there was no foreseeable harm to an interest protected by a FOIA exemption.

B. Pages RIP.   Following the segregability review, RIDS determined that 902 pages could be released in part with redactions per the identified FOIA exemptions herein.   These pages comprise a mixture of material that could be segregated for release and material that was withheld as release would trigger foreseeable harm to one or more interests protected by the cited FOIA exemptions on these pages.

C. Pages WIF.   Following the segregability review, RIDS determined that 1,570 pages were required to be withheld in their entirety. Of these, 83 pages were withheld in their entirety because they were duplicative of other pages, and 1,487 pages were withheld in their entirety because RIDS determined that all information on these pages was fully covered by FOIA Exemptions by either the FBI or OGAs. RIDS determined that any non-exempt information on these pages

[19] 5 U.S.C. § 552(a)(8)(A)(i)(II) does not impose a requirement to articulate harm for Exemption (b)(3).

was so intertwined with exempt material, that no information could be reasonably segregated for release. Any further segregation of this intertwined material would employ finite resources only to produce disjointed words, phrases, or sentences, that taken separately or together, would have minimal or no informational content.

## CONCLUSION

134.   Following collaboration with Plaintiff, the parties agreed upon a sampling from the voluminous responsive records at issue in this case. The FBI processed all such records and released all reasonably segregable non-exempt information from documents responsive to Count 6 of Plaintiff's FOIA request pertaining to Gwenyth Todd and subject to FOIA. The FBI processed the records under the access provisions of the FOIA to achieve maximum disclosure. Information was properly withheld pursuant to FOIA Exemptions (b)(1), (b)(3), (b)(5), (b)(6), (b)(7)(C), (b)(7)(D), and (b)(7)(E). The FBI carefully examined the documents and determined that the information withheld from Plaintiff in this case, if disclosed: would reveal classified and statutorily protected information; would reveal privileged information; would cause a clearly unwarranted invasion of the personal privacy, or could reasonably be expected to constitute an unwarranted invasion of personal privacy; could reasonably be expected to disclose the identities of confidential sources and the information they provided; and would disclose techniques and procedures for law enforcement investigations. After extensive review of the documents at issue, I have determined that there is no further non-exempt information that can be reasonably segregated and released without revealing exempt information.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct; and that Exhibits A through G are true and correct copies.

_____
Amie Marie Napier
Section Chief
Record/Information Dissemination Section
Information Management Division
Federal Bureau of Investigation
Winchester, Virginia